## Federal Life Insurance Company, Appellant, v. J. E. Griffin et al., Appellees.

## Gen. No. 17,093.

1. CORPORATIONS—*when assignment of use of charter by promoter not consideration, for royalty contract.* A promoter of an insurance company has no such ownership of or control over the charter of the proposed corporation, that an assignment of the right to use it is any consideration for a royalty contract, though on the subscription lists for stock it is specified that the promoter is the owner of the charter under which the company shall do business and that the board of directors is authorized to purchase the right to use the charter.

2. CONTRACTS—*consideration.* There is a consideration for a royalty contract between an insurance company and its promoter where the promoter gives therefor the use of his plans, method and system of selling insurance which from the large amount of business transacted, evidently proved valuable, though the use thereof was subsequently discontinued.

3. CONTRACTS—*when not proved unconscionable.* A royalty contract by a promoter with an insurance company is not proved unconscionable where the evidence as to the promoter's royalties, amounting to about $10,000 a year is opinion evidence and does not show a "load" equal to that required to pay the royalties could not be successfully carried by the company.

4. CONTRACTS—*when equity cannot compel cancellation.* A court of equity is not authorized to compel cancellation of a contract otherwise valid, merely because one of the parties may sustain loss.

5. INSURANCE—*when fraud in securing royalty contract not shown.* The fact that six stockholders owning but $10,000 out of the $125,000 of capital stock may not have been informed that certain plans were to be purchased from a promoter, such fact being known to all the other stockholders, is not sufficient to warrant a finding that there was any actual fraud by the promoter

or his associates in securing a contract for certain royalties in return for the plans.

6. INSURANCE—*when constructive fraud in securing royalty contract*. Though a promoter of an insurance company in his stock subscription lists specifies that the directors shall authorize the payment of certain royalties to him for the use of plans, the act of the promoter and of nine other directors to whom he had assigned part of the benefits of the proposed contract, in voting for the resolution authorizing the contract, is constructively fraudulent.

7. CORPORATIONS—*quorum*. A director interested in the ratification of an agreement with the stockholders, cannot be counted to make a quorum when the question of ratification is taken up by the directors.

8. CORPORATIONS—*when resolution not legally adopted*. Where a quorum of 15 directors is necessary, a resolution authorizing the ratification of an agreement with the stockholders is not legally adopted and a contract in pursuance thereof is unauthorized, where out of twenty-three directors present, ten are disqualified because of interest.

9. CORPORATIONS—*when contract voidable*. A contract executed in pursuance of a resolution not legally adopted because of the lack of a quorum, caused by the disqualification of certain directors because of interest, is not void, but voidable, and may be ratified by the stockholders.

10. CONTRACTS—*when voidable*. Actual or constructive fraud does not render a contract void, but merely voidable at the election of the party injured.

11. CORPORATIONS—*recovery of reasonable value of services*. On a bill to cancel a contract made pursuant to a resolution of the directors of an insurance company authorizing the ratification of an agreement with the stockholders granting royalties on insurance business for the use of defendant's plans, defendant is entitled to recover the reasonable value of the use of the plans not to exceed the contract price, whether the resolution and contract are voidable or void because of interest on the part of certain directors who voted therefor.

12. CHANCERY—*when defendant may be awarded reasonable value of services in absence of cross-bill*. On a bill to annul a contract and to enjoin actions based thereon where it appears that the contract, made pursuant to resolutions of a board of directors authorizing ratification of an agreement with stockholders, is voidable because of interest on the part of certain directors who voted therefor, the court may without a cross-bill require the complainant to pay the reasonable value of the use of the defendant's plans provided for by the contract either as relief incidental to the bill or as a condition of the relief.

13. CONTRACTS—*relief on cancellation.* Where a contract made pursuant to resolutions of corporate directors is voidable because of interest of certain directors therein, a finding on a bill to annul the contract that defendant is entitled to the contract price for the services rendered should be reversed in the absence of a showing that such price is the reasonable value thereof.

Appeal from the Circuit Court of Cook County; the Hon THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Affirmed in part and reversed in part and remanded with directions. Opinion filed October 3, 1912. Rehearing denied October 17, 1912.

CHARLES A. ATKINSON, JOSEPH P. MAHONEY and CHARLES J. O'CONNOR, for appellant.

GANNS, PEAKS & TOWNLEY, for appellees.

MR. JUSTICE FITCH delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Cook county, annulling a contract between appellant and the appellee, Griffin, and enjoining appellees from prosecuting suits at law based upon said contract, upon the condition that within sixty days from the date of the decree appellant shall pay into court for the use of appellees, the sum of $93,739.65.

It appears from the pleadings and proofs that the appellee, Griffin, in 1898 or 1899 conceived the idea that he had some new and original plans and methods for selling life insurance policies; that filled with this idea, he devoted much of his time and energy to the work of inducing others to invest their money in the organization of a life insurance company to be formed to carry out his ideas, plans and methods; that he succeeded in persuading fifty-five individuals, residing in Illinois and Wisconsin, to subscribe their names to a "preliminary" stock subscription for divers amounts, aggregating $176,000; that in this preliminary subscription list it was explicitly stated that the subscribers thereto "do severally subscribe to and agree

to pay for the number of shares set opposite our respective names, of the par value of $100 each, of the capital stock of a company to be incorporated and organized under and by virtue of the laws of the State of Illinois relating to life insurance * * * upon the condition that the said company shall organize in accordance with the terms and conditions of the proposed charter of said company, a copy of which is hereto attached, and acquire from J. E. Griffin, of Chicago, his plans, method, tables, system and policies of insurance upon the basis set forth in the statement hereto attached in regard to said plans, method, tables, system and policies;'' that attached to said subscription list was a draft of articles of incorporation of a life insurance company to be known as the Equitable Inheritance & Life Insurance Company, with its principal office in Chicago, having a capital stock of $125,000, and such powers as were authorized by the laws of Illinois, and also attached to said preliminary subscription list was an agreement reciting that J. E. Griffin ''is the originator, author and owner of the plan, methods, policies, table and system, and the owner of the charter under and by which the said Equitable Inheritance & Life Insurance Company shall do an insurance business, and that the first board of directors or officers of said Company, immediately after election, shall acquire the right and authority, and shall carry the plans, method, system and policies of said Griffin into effect under said charter in such a manner as shall be deemed for the best interests of the policy holders and said company;'' that said first board of directors is ''authorized, requested and directed'' to enter into a contract with said Griffin for the purchase from the latter of the right to use for ''100 years and thereafter, during the life of said Company'' the charter, plans, systems, etc., of said Griffin, and for the payment to said Griffin, his executors, administrators and assigns, or to whom he shall direct, of a ''royalty for the use of his plans, systems,'' etc., amounting to

two dollars for every $1,000, or fraction thereof, of insurance that may be written by the company during that time, and two dollars for every first renewal, and one dollar for each subsequent renewal thereof, such royalties to be payable quarterly, semiannually or annually, as may be agreed upon, and also to give to Griffin the exclusive right to sell insurance for said company within such five states as he may select, such agency to continue for twenty-five years, and as much longer as Griffin shall be able to write a reasonable amount of insurance; that in further consideration of the fact that Griffin "is the promoter and organizer" of said company, and "has devoted a great amount of time and energy in soliciting and obtaining applicants and applications for insurance in said company, and has expended large sums of money in and about procuring such applications    *    *    *    and in promoting the organization of said company;" said Griffin shall receive, immediately after organization, a sum or commission equal to 50 per cent. of the first year's premium upon all applications procured by him or his associates prior to the date of the completed organization of the company; and, further, that the company, when organized, shall repay to Griffin all his legitimate expenses and moneys expended by him "in forming and making complete the organization of said company, including the charter and all expenses or sums of money expended therefor or on account therefor;" that on January 24, 1900, Griffin issued a call for a first meeting of the subscribers, to take place on February 10, 1900; that thirty of the fifty-five subscribers attended said meeting in person; that at said meeting the appellant corporation was formally organized, the name being there changed to Federal Life Insurance Company; that thereupon, a new and second subscription to the capital stock of the Federal Life Insurance Company was prepared in the usual form of such stock subscriptions, and signed by those present at the meeting; that of those who had signed

the preliminary subscription list, nine persons, whose subscriptions aggregated $51,500, did not respond to the call for said meeting, nor sign the second list, and of those who were present and signed the second list, seven reduced the amount of their first subscriptions to the extent, in all, of $21,500; that the remaining $103,000 of the subscriptions in the original list were again subscribed in the second list, and to make up the remainder of the $125,000 of capital stock, twelve persons whose names do not appear upon the preliminary subscription list signed the second subscription; that at said stockholders' meeting a resolution was introduced and unanimously adopted, by the terms of which the board of directors was "authorized and directed to take all necessary action to perfect and complete the organization of this company * * * in accordance with all the terms and conditions of the preliminary subscription list to the capital stock of this company, relative to acquiring from J. E. Griffin, of Chicago, Illinois, his plan, system and policies of insurance, and all matters connected therewith, including the payment to said J. E. Griffin of all expenses incurred by him and his associates in and about the organization of this company"; that at said meeting articles of incorporation were adopted substantially in the same form as the draft of such articles attached to the preliminary subscription list, in which was an article providing that the corporate powers shall be vested in a board of directors, to consist of eighteen stockholders, which number may be increased at any stockholders' meeting to not exceeding thirty-six, and that the board of directors shall have power to determine, in its by-laws, the number of directors that shall constitute a quorum for the transaction of business; that at said stockholders' meeting a resolution was adopted fixing the number of directors at thirty; that twenty-eight directors were then elected; that immediately following the stockholders' meeting, a meeting of the directors was held, at which there were pres-

ent, in person, twenty-three of the twenty-eight who had been elected directors; that the directors adopted a set of by-laws, among which was one providing that a majority of the members of the board shall constitute a quorum for the transaction of business; that a resolution was unanimously adopted by the directors then present, authorizing and directing the officers of the company "to take all necessary action to perfect and complete the organization  *  *  *  in accordance with all the terms and conditions of the preliminary subscription list to the capital stock of this company relative to acquiring from J. E. Griffin of Chicago, Illinois, his plan, system and policies of insurance and all matters connected therewith," etc., following the identical form of the resolution previously adopted by the stockholders; that prior to said meeting of stockholders, Griffin had assigned to divers persons interests in his proposed contract with the proposed corporation, and of the twenty-three directors who voted for said resolution ten directors, including Griffin, were personally thus interested in the proposed contract and therefore interested in procuring the execution of the same, leaving but thirteen disinterested directors who voted for said resolution; that none of said disinterested directors was aware of the fact that Griffin had made such assignments, nor of the fact that nine of the directors present besides Griffin were interested with him in the proposed contract; that in pursuance of the resolutions thus adopted at both the stockholders' and directors' meetings, the president and secretary of the company, in June, 1900, executed a formal contract providing for the payment of "royalties," as above stated, to Griffin for the use during the life of the company of his plans, methods and system of life insurance, and on other dates executed other contracts with Griffin, making him the exclusive agent of the corporation in a number of states of the union; that in pursuance of the same resolutions, the officers paid to Griffin over $8,000 for the preliminary expenses paid

and incurred by him in procuring stock subscriptions and applications for insurance; that the corporation so organized began the business of selling life insurance policies; that for several years it used the methods proposed and taught by Griffin with one exception, with the result that during the first year of its corporate existence, through agencies organized by Griffin, it sold in excess of $2,000,000 of life insurance; that at the first annual meeting of stockholders following the organization, the president, in his report to the stockholders, stated that the company held "the world's record for the largest volume of business ever written in its first year by any company now writing life insurance," and the same statement, in substance, was printed and mailed to all its policy holders, with this addition: "The magnitude of the results secured cannot fail to challenge attention and commendation everywhere. These facts deservedly bring the Federal into conspicuous prominence throughout the insurance world. The results secured will be especially gratifying to the friends and policy holders of the Federal;" that during the first year or two Griffin had the sole charge of the selling agencies of the company; that he procured a copyright upon one form of insurance policy, and that this policy was used by the appellant in writing a large amount of insurance; that he was the only person among the directors or stockholders who at that time had any expert knowledge of the principles or business of life insurance, and was the person upon whom the officers and directors relied for expert counsel and advice in conducting the business of the corporation; that after the lapse of several years, however, the directors and officers gradually changed their plan and methods of doing business and the form of their insurance policies, until few, if any, of the original plans, methods and policies were used at all; that prior to 1903 the officers of the company solicited and obtained from Griffin and his associates waivers of the royalties provided by the contract to be

paid, and nothing has been paid at any time to Griffin or his associates for or on account of such royalties; that in 1903 Griffin made a demand upon the officers of the company for an account of such royalties, to which no attention was paid, and thereupon he caused an attorney to write to the company, making a formal demand for an accounting of all moneys due to Griffin; that the president sent a reply to the effect that he was directed by the executive committee of the board of directors to say "that this company denies any indebtedness of any kind or nature to Mr. Griffin;" that in July of the same year, Griffin wrote the company demanding a full statement "of my account, including the accumulations under royalty contract, etc.," to which the president replied by quoting his previous letter to Griffin's attorney, and adding: "The position of this company relative to the subject matter of your letter is as indicated in said letter to your attorney"; that following these letters, however, the company's officers continued to request the several owners interested in the royalty contract to waive their claims for the time being, in view of the fact that the company had not been able to pay a dividend; that in the latter part of 1905 Griffin wrote another letter, making a formal demand for a sworn statement "showing the business done by your company in the sale of insurance and of renewals thereof from the first day of June, 1900, to the first day of October, 1905," and for "the immediate payment to me of the royalties accruing to me during the period above mentioned, in accordance with the terms of the contract executed between you and myself, dated June 1, 1900;" that upon the failure of the appellant company to respond to this demand Griffin brought two suits against appellant, one for $50,000 and the other for $20,000, for royalties alleged to have accrued under said contract; that in March, 1907, appellant filed this bill in the Circuit Court, reciting in substance, the facts regarding the organization of the company, the passage of the

resolutions above mentioned, the execution of the royalty contract and the beginning of the suits by Griffin, alleging that the contract was void because it was not authorized by a disinterested majority of the board of directors, and because it was unconscionable, unreasonable and oppressive, and praying that said contract be cancelled and the prosecution of said suits be enjoined; that a temporary injunction was issued in accordance with the prayer of the bill, and that the chancellor, after hearing the evidence, found and adjudged that the contract was voidable, but that the defendants (who are the present owners of the various interests in the contract) are entitled to an accounting from the appellant, for the reason that the contract was not rescinded prior to the filing of the bill of complaint; then found that there was due to the defendants under said contract, with interest, $93,739.65, and thereupon adjudged and decreed that upon the payment within sixty days of that sum into court for the use of the defendants, and upon the surrender to Griffin of such of his plans, methods, tables and systems of insurance as had been "delivered to and accepted by said complainant as a consideration" therefor, the contract should be cancelled, annulled and held for naught, and the defendants be perpetually enjoined from proceeding with the pending suits and from instituting or bringing any suits to enforce the contract, and that in the event of the failure of the complainant to perform the conditions thus imposed, "the contract shall be a valid and binding obligation upon complainant" and the injunctions theretofore issued be dissolved. The complainant appeals from said decree and assigns numerous errors.

The questions involved in the assignments of error may be briefly stated as follows: (1) Was there any consideration for the contract? (2) Was the contract so unreasonable or oppressive as to justify the interference of a court of equity? (3) Was there any fraud, actual or constructive, in procuring the execu-

Federal Life Ins. Co. v. Griffin, 173 Ill. App. 5.

tion of said contract, and was the contract void or voidable for that reason or because of the fact that ten of the directors were personally interested therein? (4) If voidable only, and not void *ab initio,* did appellant ratify the contract by its subsequent conduct, or did appellant rescind or disaffirm it within a reasonable time? (5) Was the decree of the lower court erroneous in imposing conditions to the relief sought and thus granting relief, in effect, to the defendants without the filing of a cross-bill?

It is urged, strenuously and at great length, by appellant's counsel, that appellant received no consideration whatever for the contract in question. We cannot agree with this contention. It may be conceded that Griffin had no such ownership of or control over the *charter* of the proposed corporation that an assignment to appellant of the "right to use the charter" can be considered as any consideration for the royalty contract. But the contract also provides for the use by appellant of Griffin's plans, method and system of selling life insurance. That the use of such plans, methods and system was of considerable value to appellant during the first years of its corporate existence must be apparent, we think, from the mere statement of the facts above recited; and the mere fact that the use of such plans, methods and system has since been discontinued by appellant does not, of itself, even tend to prove that such use was not of great value prior to the time it was so discontinued.

Nor can we agree with appellant's contention, that the contract was unconscionable. While it is true that a great mass of evidence was introduced for the purpose of showing that no life insurance corporation could successfully compete with other like corporations if burdened with the payment of such royalties as are provided for by the contract in question, yet this evidence was all "opinion evidence," based upon hypothetical questions involving a comparison of business methods of other corporations, the answers to which

depend so much upon the personality of the officers and agents of such corporations, and their ability to' successfully conduct a life insurance business, as to leave the whole subject a matter of pure conjecture and speculation. We see nothing in such evidence sufficient to warrant us in finding as a fact that a "load" equal to that required to pay the royalties specified in the contract in question (about $10,000 a year) could not have been successfully carried and paid by the appellant corporation, if it had elected to approve the action of its board of directors. The burden of proof to establish that fact, if it be a fact, was upon the appellant, and we think it has failed to sustain that burden. In any event, we know of no principle which would authorize a court of equity to compel the cancellation of a contract merely because one of the parties thereto will possibly or probably sustain a loss, if the contract is otherwise valid.

The most important question here involved is whether appellant has the right to disaffirm the action of its directors and officers upon the ground of fraud or illegality, and if it has that right, whether it may do so without returning the consideration it has received or its equivalent value. Appellant's counsel urge that an affirmative answer must be given to both branches of this question. They contend that the contract was fraudulently obtained by a trustee who made use of his position as such to secure to himself an unlawful advantage over his *cestuis que trust,* and that a contract thus obtained is void *ab initio,* on grounds of public policy. It is conceded by appellees' counsel that directors of a corporation are trustees for the stockholders; that in the performance of their duties, they must observe the utmost good faith; and that for this reason, the vote of a director upon any matter in which his personal interests conflict with those of the stockholders whom he is elected to represent, cannot be counted. But they contend that in this case there is no proof of any actual fraud or fraudulent intent

on the part of Griffin, and that if his vote and the votes of his nine associates can be held to be constructively fraudulent, the contract is not void for that reason alone, but is, at most, voidable at the election of the corporation; and that one who elects to rescind or disaffirm such a contract must return or offer to return the consideration received for the same. The chancellor adopted the latter view; and in this we agree with him, except as to the method apparently adopted by him to ascertain the value of the consideration so received.

We think there is nothing in the proofs submitted, except the single fact that ten interested directors of the twenty-three directors voted, and were counted as voting, in favor of the resolution authorizing the execution of the contract in question, that shows any fraud or fraudulent intent on the part of Griffin and his associates. All but twelve of the stockholders, and all of the directors, signed the preliminary contract of subscription and must therefore be held to have had full knowledge of the purpose and meaning of the resolution. Of the twelve new subscribers, the record shows that all but five or possibly six were represented at the stockholders' meeting by other stockholders who had such knowledge. Under such circumstances, we cannot hold that the fact that six stockholders, owning but $10,000 out of the $125,000 of capital stock, may not have been told, or otherwise informed of what was fully known to all the rest of the stockholders, is sufficient, of itself, to warrant a finding that there was any actual fraud or fraudulent intent on the part of Griffin and his associates. We think, however, that the act of the ten interested directors in voting for the resolution adopted at the directors' meeting, must be held to be constructively fraudulent. "Constructive fraud is such as the law infers from the relationship of the parties or the circumstances by which they are surrounded, regardless of any actual dishonesty of purpose." (14 A. & E. Encyc. of Law, 2nd Ed.

21.) "By constructive frauds are meant such acts or contracts as, although not originating in any evil design or contrivance to perpetuate a positive fraud or injury upon other persons, are yet, by their tendency * * * to violate public or private confidence * * * deemed equally reprehensible with positive fraud." (1 Story Eq. Sec. 258.) Under the by-laws of appellant as above stated, a majority of the directors constituted a quorum for the transaction of business. The presence of fifteen directors was therefore necessary. Twenty-three were in fact present when the resolution was adopted, but ten of them were personally interested in the subject-matter of the resolution. An interested director cannot be counted for the purpose of making a quorum. Leary v. Interstate Nat. Bank, 63 S. W. 149; Curtin v. Salmon River Etc. Co., 130 Cal. 345; 3 Clark & Marshall on Private Corporations, Sec. 681. The moment, therefore, that the resolution came before the meeting for action, the quorum was broken, for there were only thirteen directors whose lack of personal interest entitled them to be counted as present. For the purpose of acting upon the matter of said resolution, the ten interested directors were as much disqualified as if they were absent from the meeting. The resolution, therefore, was never legally adopted, and the contract executed in pursuance thereof was unauthorized.

But it does not follow from this, that the contract was therefore absolutely void. In 3 Clark & Marshall on Private Corporations, Section 760, the author states that the rule in such cases is as follows: "All of the authorities agree that the majority of directors must be disinterested in respect to the matters voted upon, If one or more of them are personally interested in a contract or other transaction voted upon by the board, and less than a majority are disinterested, the corporation may set the transaction aside. Some of the courts go further than this, and hold that the transaction is not merely voidable at the option of the cor-

poration, but that it is absolutely void. But by the weight of authority, it is merely voidable and may be ratified or acquiesced in by the stockholders and thereby rendered binding.'' The rule in Illinois in this respect is in accord with the weight of authority, as thus stated. Brown v. DeYoung, 167 Ill. 549; Adams v. Burke, 201 Ill. 395; Chicago Hansom Cab Co. v. Yerkes, 141 Ill. 320; Higgins v. Lansingh, 154 Ill. 301; Beach v. Miller, 130 Ill. 162.

As stated above, the contract here involved was constructively fraudulent. The effect of fraud upon a contract, whether actual or constructive, is not to make the contract absolutely void, but merely to render it voidable, at the election of the party injured. Union Stock Yard & T. Co. v. Mallory, 157 Ill. 554.

It has also been held that where an officer of a corporation, with the knowledge but without the express authority of his corporation, enters into a contract beneficial to the corporation, but from which he also derives a personal benefit, as in a lease to the corporation of a building owned by him, the contract is not void, but if acquiesced in by the corporation, becomes a binding contract. L. N. A. & C. Ry. Co. v. Carson, 151 Ill. 444; Ashley Wire Co. v. Ills. Steel Co., 164 Ill. 149, 156; People v. Penn. Mut. L. Ins. Co., 126 Ill. App. 281.

But if it be conceded that the contract was void—a mere nullity for want of power on the part of the directors to make it—it does not follow that appellant may therefore be permitted to receive and keep the benefits of such contract without incurring any liability whatever to account to appellees therefor. In Brennan v. Gallagher, 199 Ill. 207, a former stockholder of a loan association surrendered his stock at maturity and settled with the association but deposited a portion of the amount received with the association under its contract to pay him interest for the use of his money. The association became insolvent, and in the distribution of its assets in equity, it

was held that he was entitled to be paid the amount so deposited, with interest, since, even if the contract was *ultra vires* and therefore void, the corporation which had received the money could not be permitted to retain it without liability. The court there said (p. 211): "Simply because it undertook to do what it was not authorized to perform and upon such undertaking received money from appellee which it had no right to receive, does not exempt it from all liability *but it is in duty bound to refund what it has received,* upon demand. The contract being only *ultra vires,* and not *malum in se* or *malum prohibitum,* and the corporation having received money under it which in equity and good conscience belongs to appellee and which it ought to pay over to him, it is liable in an action for money had and received, with interest at the legal rate from demand made. *Such an action would not enforce or even recognize the contract, but would disaffirm it.*" (Italics ours.)

The same reasoning, in effect, was used in a recent case (Voorhees v. Mason, 245 Ill. 256), where the facts were more nearly analogous to those of the present case. In that case a bill was filed on behalf of a corporation against six of its seven directors to require them to account and pay over to the corporation certain commissions alleged to have been received by them and unlawfully retained. It appeared from the evidence that the six directors were officers of the corporation and that as directors they had passed a resolution allowing such commissions to the secretary and the directors for making sales of stock and "income certificates." The chancellor dismissed the bill for want of equity. The Supreme Court held that because the directors had "by their own votes fixed the value of their commissions," the resolution thus adopted was "not conclusive upon the corporation," and therefore that "the directors could not rightfully retain commissions for such sales by virtue of said resolution." But the court further held as follows (p. 264):

''The services of the secretary and other officers of the corporation in making sales of stock and income certificates were of value to the corporation, and upon proof of the value of such sales, regardless of the resolution, they may rightfully be allowed compensation for making such sales,—that is, allowed such sum for such services as the same are reasonably worth, not to exceed the amount fixed by the resolution,—it being our view that the resolution having been passed for the express purpose to authorize the directors to sell the stock and income certificates and to receive commissions for such service, and that resolution having been adopted by the votes of the directors who were to benefit from its adoption, it was void, and that such directors could only recover what their services (their services in that behalf being outside of their duties as directors or officers) were reasonably worth, but that they having made said sales while the resolution which had been passed by their own votes was unrescinded, they should be estopped to claim that they were entitled to receive more in the way of commissions for making said sales than the amount fixed by their own votes; that while the resolution was not binding upon the corporation, it was binding, by way of estoppel, upon the directors.''

Applying the same reasoning to the facts of this case, if the use of Griffin's plans, methods and system of selling life insurance policies was of value to the corporation (and we have held that it was) then upon proof of the value of such use ''regardless of the resolution,'' appellees would equitably be entitled to recover such sum as the use aforesaid was reasonably worth not to exceed the amount fixed by the contract. And whether the contract be regarded as void or voidable we think that the reasonable value of the use of Griffin's methods and policies is all that appellees ought in equity to receive under the facts of this case, and all that appellant ought in equity to be required to pay. We entertain no doubt as to the power of the court to require the appellant to pay such value to appellees without a cross-bill, either on the theory that

such a requirement is merely incidental to the relief sought by the bill, or on the theory that it is imposed as a condition to the relief sought. On either theory a court of equity has the power to require the complainant to "do equity." The chancellor, however, allowed the full amount of accrued royalties, with interest. If this amount be equal to the reasonable value of the use which appellant has made of Griffin's plans and policies, there would be no error in the ruling. But we have been unable to find any evidence to that effect in the record before us. The case will therefore have to be reversed to permit the further taking of testimony on this sole point.

We have carefully considered the remaining questions regarding the alleged ratification and laches on the one hand and the alleged· disaffirmance on the other, and deem it sufficient merely to say that we· think the findings of the chancellor in such respects are sustained by the evidence.

The decree of the Circuit Court, for the reasons given, will be affirmed in all respects except as to the amount therein required to be paid by the complainant; and as to· that provision, the decree will be reversed and remanded with directions to take proofs as to the reasonable value of the use made by the appellant of the plans, methods, system, table and policies of J. E. Griffin from June, 1900 to March 19, 1907 (the date of the filing of the bill); and when found, to enter a decree requiring appellant to pay within sixty days thereafter the amount of such reasonable value with interest from July 11, 1903, the date of the letter from Griffin demanding payment of royalties, to the date of such decree, as a condition to the cancellation of the contract recited in the bill of complaint.

*Affirmed in part and reversed in part and remanded with directions.*