Henry White, Plaintiff, Mary White, Conservator of the Person and Estate of Henry White, Incompetent, Appellee, v. Mary White, et al., Defendants. Appeal of Martha E. Carter and Everett J. Hill, Certain Defendants-Appellants.

Gen. No. 48,033.

First District, Third Division.

November 2, 1960.

Rehearing denied November 25, 1960.

Robert L. Huttner and Martin S. Gordon, of Chicago (Robert L. Huttner, of counsel) for appellants.

Prescott, Burroughs, Taylor & Carey, of Chicago (A. M. Burroughs, of counsel) for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

The controversy in this case is over $2,844.57 on deposit with the Treasurer of Cook County. It came into his possession through a condemnation suit brought by the Chicago Housing Authority against a

two-story house located at 4516 South Evans Avenue, Chicago.

A judgment was returned in the condemnation suit for $8,009.69, which was the original sum placed in the Treasurer's hands. After various obligations were paid, the balance remaining was $5,689.13. The house had been owned in joint tenancy by Henry White and his wife, Mary. One-half of the balance was turned over to Mary; the other half is claimed for Henry White by Mary, his conservator, and by the appellants, Everett J. Hill and his nominee, Martha E. Carter. The appellants' claim is based upon a contract of sale between Henry White and Martha Carter, and a quitclaim deed from White to her. The chancellor entered a decree, in accordance with the recommendation of a master in chancery, finding that the money belonged to White. He removed both the contract and the quitclaim deed as clouds upon White's title and taxed $500.00 costs against Carter and Hill.

The house was acquired by the Whites in 1930. In December 1953, White, who had left home in November, filed a partition suit against his wife. No mention was made of Martha Carter, although it was subsequently revealed that White had signed a contract to sell the property to her the previous August.

Nothing further took place in the partition suit until December 5, 1958, when Carter and Hill entered the dormant litigation. Their intervention was prompted by the condemnation award which had been made in October 1958. On December 10th, the court allowed a supplemental complaint, which had been filed by the Whites on December 8, 1958, to stand as answer to the claim of Carter and Hill.

The supplemental complaint spoke of the contract only, and asked that Carter and Hill be divested of any interest in the premises and be barred from participation in the condemnation judgment. Carter answered

22

that White knew, when he filed the partition suit, he had a contract with her, and that on November 5, 1955, he had executed a quitclaim deed to her. She prayed that her interest in the property be declared by the court. The Whites replied that the alleged quitclaim deed had never been recorded and that Carter and Hill had entered appearances in the condemnation suit but neither proved nor claimed any interest in the property.

Before further examining the evidence concerning the contract and the quitclaim deed, it seems advisable to review three of the more general issues which have been raised. These are but three of some twenty-odd points argued by both sides. Although all have been considered, only those believed to be pertinent to the determination of this appeal will be discussed.

██ ██ The appellee argues that a freehold is involved and asks for a dismissal of the appeal because the appellants did not take their appeal to the Supreme Court. If a freehold were involved the proper motion would be to transfer the appeal, not to dismiss it. A freehold is only indirectly involved. Although a determination of the prior title is necessary to the correct distribution of the condemnation award, a decision concerning the award will not affect the present title. No freehold will be gained or lost by the decision of this court. Medical Center Commission v. Banks, 413 Ill. 397, 109 N.E.2d 211.

██ The appellee also urges the dismissal of the appeal upon the ground that the doctrine of res judicata applies because the appellants had filed appearances in the condemnation suit but had not claimed nor proved title or interest in the premises. The record before us does not confirm these assertions. The record in the condemnation suit was not incorporated in this appeal, and no testimony was offered and no exhibits were introduced in this trial concerning that suit.

23

The master's report made no finding and the chancellor made no adjudication of this issue. We have no way of ascertaining if Carter and Hill were parties to that suit, entered voluntary appearances, or whether they filed a cross-petition under section 11 of the Eminent Domain Act, Ill. Rev. Stat., ch. 47 (1959). The Whites failed to meet the burden devolving on the party who asserts the defense of res judicata. It was their obligation to show with clarity and certainty the parties, the precise issues and the judgment of the condemnation suit, and what it had in common with the pending action. Gillies v. Little Vermilion Special Drain. Dist., 401 Ill. 344, 81 N.E.2d 916; Ramsay v. Ramsay, 10 Ill.App.2d 459, 135 N.E.2d 172.

The appellee's brief also cites section 14 of the Eminent Domain Act to the effect that the court in an eminent domain proceeding has exclusive jurisdiction to determine conflicting compensation claims. Section 14 is not applicable. The part of the statute giving the eminent domain court exclusive jurisdiction of controversies similar to this was added by a 1959 amendment to the Act. The condemnation suit was terminated in 1958.

██ ██ In January 1959, during an early hearing of this case, a chancellor of the Superior Court concluded that White was incompetent. He suggested a conservator. Mrs. White was appointed the conservator by the Probate Court in February 1959. This appointment has led to the third issue, a contention by the appellants that Mrs. White is not entitled to equitable relief because she was never substituted for Henry White as party-plaintiff. Section 54(3) of the Civil Practice Act provides that "if a party is declared incompetent, that fact shall be suggested of record and the prosecution or defense shall be maintained by his representative, guardian ad litem or next friend, as

24

may be appropriate." Ill. Rev. Stat., ch. 110, sec. 54(3) (1959). Earlier subsections of section 54 provide that upon an event causing a change or transmission of interest or liability, or upon the death of a party, the proper party or parties may be substituted by order of court upon motion. Ill. Rev. Stat., ch. 110, secs. 54(1), (2). No such procedure is made mandatory in cases of incompetency. The statutory procedure was followed in this case. On February 4, 1959, an order was entered which noted that Henry White had been declared incompetent and Mary had been issued letters of conservatorship by the Probate Court. Furthermore, there is nothing in the record showing that the appellants at any time during the subsequent hearings, before the court or the master, raised the question of substitution. Nor did they make any objection on this point to the master's report. Mary White was no stranger to the litigation. Carter and Hill accepted her both as a plaintiff and as Henry White's conservator. Under these circumstances they cannot now complain of the failure to make a formal substitution.

During the oral argument we were informed that Henry White had died. Later the appellee filed suggestions of his death and of the appointment of Mary White as the administrator of his estate. Accordingly, Mary White, conservator, will be replaced by Mary White, administrator, as plaintiff and appellee in this case.

■ The contract in dispute was dated August 19, 1953. It stated that Henry White and Mary White, husband and wife, agreed to sell the Evans Avenue house for $3,750.00, with $500.00 of this down and the balance of $3,250.00 to be paid upon a warranty deed being furnished. But White alone signed it. Hill, in endeavoring to establish the contract as an agreement by White to sell only his share, testified that they used a contract which both Whites had given to

Richard M. O'Brien some five months earlier, and that O'Brien's name as purchaser had been erased and Carter's substituted. He testified he had represented the Whites in the sale to O'Brien, a real estate dealer, but that O'Brien had rejected the contract upon learning there was an encumbrance on the property. He said that he and White obtained the contract from O'Brien and brought it back to his office where the new sale was arranged. The O'Brien contract was in evidence. It was an agreement by Henry and Mary White, dated March 30, 1953, for the sale of their house for $3,750.00. It had been recorded on February 18, 1954. Hill did not explain, if other names had been changed on the contract, why Mary White's name as a seller had not been removed; he did not explain why he, who also dealt in real estate, was willing to pay $3,750.00 for Henry White's one-half interest in the still encumbered building, when O'Brien refused to pay the same amount for the full property; nor did he explain, if O'Brien had rejected and returned his contract in August 1953, why O'Brien recorded the same contract in February 1954, and did not give his quitclaim deed to the White's until August 1954. The conclusion is inescapable that the O'Brien contract was in existence and in force at the time the Carter contract was signed. The conclusion is also inescapable that the Carter contract was intended for both Whites. The contract was never executed; Mrs. White never signed it; the $500.00 earnest money was never received; a warranty deed was never given, and the balance of $3,250.00 was never paid. The chancellor had ample reason for cancelling the contract.

We reach a different conclusion, however, regarding the quitclaim deed. The deed was purportedly signed by White on November 5, 1955, but it was not notarized until October 10, 1956, on which date White re-signed it at the request of the notary. The deed, which stated

26

a consideration of $10.00, was never recorded. The master doubted if White was capable of understanding the effect of the document he signed. The chancellor found there was no consideration for the deed and that there was no intention on White's part to sell his interest. The decree recited that White was 85 years of age, could not read or write, could sign his name only in an unintelligible way, was badly crippled, had been found mentally incompetent in 1959, and implied that advantage had been taken of him.

■■■■■ The difficulty, however, is that it was not alleged that White was incompetent or that he was the victim of undue influence or fraud, and no proof was offered of his mental condition at the time the deed was signed or re-signed. A deed which recites a consideration, even a nominal one, cannot be cancelled because of inadequacy or failure of consideration unless there has been clear and convincing evidence of fraud or undue influence. Johnson v. Fulkerson, 12 Ill.2d 69, 145 N.E.2d 31; Matanic v. Krajach, 392 Ill. 547, 64 N.E.2d 885. A complaint which does not contain these or similar allegations, or which does not aver the mental incapacity of the grantor, is insufficient to sustain a decree based on such grounds. Byron v. Byron, 391 Ill. 256, 62 N.E.2d 790. The incompetency of White in 1959 does not prove his incompetency in 1955. The burden of proving mental incapacity at the time of a transaction is upon the party who seeks to set aside the transaction. Persons of mature age are presumed sane and mental incompetency cannot be inferred merely from old age or physical illness. Staude v. Heinlein, 414 Ill. 11, 110 N.E.2d 228; Stoltze v. Stoltze, 393 Ill. 433, 66 N.E.2d 424.

Several items of evidence lend support to the chancellor's supposition that White must have been imposed upon, and the aura of suspicion surrounding the

27

contract naturally extends to the deed. Hill's concealment of the deed tends to make him suspect. If it was signed in November 1955, Hill must have had it in his possession at the time he recorded the contract in February 1956. Why he recorded a contract of sale which gave him but the right to purchase the property, and not the deed which gave him title to it, is unexplained. At no time after November 1955, did he exercise the privileges or share the burdens of ownership. Mrs. White heard nothing about her new coowner either from him or from her husband, who had returned home months before November 1955 and had lived there months afterward. The attorney who drafted the Whites' supplemental complaint apparently was unaware of the deed. Carter's answer introduced it for the first time into the case, and it became an issue when she prayed, "(1) That her interest in said property be defined and declared by this Court." Hill did not reveal it until the condemnation judgment was being distributed. He delayed until he could wait no longer. These circumstances, and the inferences which can be drawn from them, are of probative value but, standing alone, are insufficient to support a finding of fraud or undue influence and, in the absence of pertinent averments, cannot be considered.

The Whites' reply sought, but neglected to pray for, an accounting from Hill for rents collected by him from December 1953 to October 1958. This came about in the following fashion: About the time White filed his partition suit he also brought a forcible entry and detainer action against the tenant who occupied the house. He secured an order directing the tenant to pay one-half of the rent to him and one-half to his wife. Hill, whose place of business was nearby, collected White's share of the $100.00 monthly rent. Hill doled this money out to White in various amounts at ir-

28

regular intervals. The same pattern of collection and disbursement continued after the deed was signed.

The master heard evidence concerning this issue and received an exhibit from Hill detailing his expenditures in behalf of White. But no balance was struck. The chancellor found the rents belonged to White and that the terms of the contract had not been fulfilled either as to earnest money or as to payments. He further found that Hill contributed nothing toward the expenses of the property. The evidence on the latter subject showed that Mrs. White, being unaware of Hill's interest, continued to pay all the taxes, improvements and maintenance costs.

■ Equity demands an accounting. Hill must account for the rents he received prior to the execution of the quitclaim deed, and for the balance of the purchase price which, as the appellants acknowledge in their brief, remains unpaid: "We do not claim that Everett J. Hill, paid the entire purchase price of $3,750.00. . . ." Although adequacy of consideration cannot be questioned to vacate a conveyance, the subject of consideration can be gone into in a proper action to ascertain if it has been paid and to recover what is unpaid. Stannard v. Aurora E. & C. R. Co., 220 Ill. 469, 77 N. E. 254; Lloyd v. Sandusky, 203 Ill. 621, 68 N. E. 154. Also, since Hill acquired one-half ownership of the property, it should be considered whether he had an obligation to bear one-half of the necessary expenses incurred between the date of his acquisition and the fulfillment of the condemnation judgment.

This cause will be remanded with directions to permit the parties to amend their pleadings, if they so choose, to the end that a full accounting may be had upon all financial items in dispute. Ill. Rev. Stat., ch. 110, sec. 92(1)(e) (1959). City of Aurora ex rel. Egan v. Y.M.C.A., 9 Ill.2d 286, 137 N.E.2d 347; Jones

v. Jones, 26 Ill.App.2d 484, 168 N.E.2d 783. It will also be necessary for the trial court, in view of our decision, to re-examine the apportionment of the costs.

The decree of the Superior Court will be affirmed as to the contract, reversed as to the quitclaim deed and the taxing of costs, and remanded with directions.

Affirmed in part, reversed in part and cause remanded with directions.

SCHWARTZ, P. J. and McCORMICK, J., concur.