*In re* ESTATE OF ESTHER NEPROZATIS, Incompetent.—(KAREN BAINES, Petitioner-Appellee, *v.* ROBERT WHITE, d/b/a J & B Heating and Cooling Company, Respondent-Appellant.)

First District (2nd Division)   Nos. 77-1771, 78-254 cons.

Opinion filed July 18, 1978.—Rehearing denied August 16, 1978.

564

Arthur E. Engelland, of Chicago (David A. Epstein and Jann, Carroll, Kruse & Sain, Ltd., of counsel), for appellant.

Ditkowsky & Contorer, of Chicago (Kenneth K. Ditkowsky, of counsel), for appellee.

Mr. JUSTICE PERLIN delivered the opinion of the court:

This case involves the rescission of a home repair contract between Robert White, d/b/a J & B Heating and Cooling Company, and Esther Neprozatis. Subsequent to the execution of this contract, Neprozatis' granddaughter petitioned the circuit court of Cook County for a citation to recover Neprozatis' assets. This petition alleged that Esther Neprozatis was incompetent; that she had come under the influence of Robert White; that she was unable to resist the demands of White; and that White had obtained from her approximately $25,000 for pretended home improvements. After a hearing without a jury, the circuit court ordered White to return $27,389 to Neprozatis. White appeals, contending that the amount of the judgment is not supported by the record; that the circuit court failed to recite a valid ground for its order of rescission; and that the court erred when it based its determination of unconscionability on the premise that there was only one contract between the two parties and when it considered its own experience in ascertaining the proper value of the repair services.

Karen Baines, Neprozatis' granddaughter, filed the citation petition on April 11, 1977. This petition indicated that Baines' request for appointment as conservator of Neprozatis' estate was pending. Subsequent to discovery proceedings, Baines amended her petition. The hearing on the amended petition commenced on September 21, 1977.

The evidence elicited at this hearing revealed that Esther Neprozatis is an 81-year-old widow; that she lives in a house that is approximately 60 years old; that sometime in early January of 1977 she allegedly telephoned J & B Heating and requested a furnace inspection; that in response to this request White sent a subcontractor to her home to conduct this examination; that the subcontractor completed the $12.95 furnace inspection during which he allegedly discovered that Neprozatis' furnace had a cracked heat exchanger; that the subcontractor then called White and related what he had allegedly found; and that at this time White went to Neprozatis' house, inspected her furnace, confirmed the subcontractor's diagnosis and indicated to Mrs. Neprozatis that she would need a new furnace. During the next month, White and his subcontractors drove Mrs. Neprozatis to two savings and loans where, at their direction, she withdrew $7,489. This money was turned over to White prior to the installation of the new furnace. Subsequent to this, additional repairs were made in Mrs. Neprozatis' home, and she issued additional checks to White to pay for this work. The following is a summary of all the work performed by White's subcontractors and the money paid therefor:

| Money received by White | Date money received | Work performed by White's subcontractors for price stated at left |
|---|---|---|
| $2500 | 1/10/77 | Furnace installation and humidifier. |
| $1789 | 1/20/77 | Electric clock Cronotherm, transformer, new wiring, new duct to chimney. |
| $3200 | 1/24/77 | New duct work. |
| $2500 | 2/5/77 | Central air conditioning and its installation. |
| $2500 | 2/5/77 | 100 AMP Electrical Service and its installation. |
| $1700 | 2/24/77 | Electric air cleaner. |
| $5800 | 2/24/77 | House repair and repainting. |
| $2800 | 2/26/77 | Additional sheet metal work. |
| $2300 | 3/14/77 | Additional electrical work. |

White introduced seven written documents which he contended were evidence of these transactions. Although these writings contained a correct description of the work performed and the corresponding amounts involved and appeared to have been signed by Mrs. Neprozatis, Karen Baines testified that the signature on five of the documents was not that of her grandmother.

White conceded that he did not do any of the work performed at Neprozatis' home but stated that he parcelled out the work to various subcontractors. He also admitted that he inspected the quality of his subcontractors' work only on occasion, and that on this particular job he paid the subcontractors a commission equal to 10% of the amount billed to the customer for each task. White further testified that his cost for having the repairs done to Neprozatis' home amounted to approximately $6502, and he indicated that this figure was based on his expenditures for materials, labor and commissions.

Petitioner's expert witness, who had 40 years of experience as a registered engineer and architect and who was a professor of architecture at the University of Illinois, indicated that he had carefully examined all of the work done to Mrs. Neprozatis' home and gave extensive testimony as to the retail and wholesale value of the materials used by White's subcontractors. He stated that none of the work was done in a competent, professional manner and consequently it would have to be entirely redone. For this reason he said that the labor costs should be valued at zero. He also testified that the retail value of the materials used was approximately $1,539.70; that a reasonable charge for the labor, overhead and profit, if the job had been properly done, would have been around $3200; and that the total charge for a satisfactory job should not have exceeded $4,000.

The expert witness was unable to examine the steel, hot-air furnace which was removed from the Neprozatis home to make way for the installation of White's new furnace since it had been destroyed prior to his inspection. However, he stated that in all his experience he had never observed a cracked heat exchanger on a furnace of that type. For such a crack to occur, he said that there would have to be a rapid heating of the metal to a very high temperature immediately followed by a sudden cooling. In his opinion these conditions could only be produced by a flood in the area where the furnace was located. Furthermore, the expert testified that a cracked heat exchanger could easily be identified because this condition causes the release of hydrogen sulfide gas which smells like rotten eggs.

Respondent's expert witness, who held a bachelor's degree in electrical engineering and who had 43 years of experience inspecting furnaces for People's Gas, Light & Coke Company, testified that cracked heat exchangers are common, that this condition is very dangerous, and that in the last 20 years cracked heat exchangers have become much more prevalent due to the use of aerosol sprays in the household. He explained that aerosol sprays expel halogenated hydrocarbons into the air which have a corrosive effect on the metal surfaces of furnaces and other heat producing appliances. The expert stated that halogenated hydrocarbons

would not affect the surface of a modern, electric refrigerator because it is not heat producing, but he admitted that they would corrode an older heat fired refrigerator. He further testified that a cracked heat exchanger would not necessarily produce a sulfur dioxide smell because the gas companies have reduced the sulfur content of their gas to an absolute minimum.

Esther Neprozatis was adjudicated incompetent on May 4, 1977, and Karen Baines was then appointed as her conservator. This adjudication took place approximately one month after White's subcontractors had stopped working in the incompetent's home.

Respondent contends initially that the judgment of $27,389 in favor of petitioner is not supported by the record on appeal. After carefully examining the exhibits introduced into evidence during the trial of this matter, we must agree. These receipts and checks reveal that White received $25,089 from Neprozatis, not $27,389. Accordingly, the judgment will be reduced by $2300.

White's primary argument in this appeal is that the trial court failed to state a valid ground for its order of rescission. He calls attention to the fact that the court mentioned the following three grounds when it rendered its decision: unconscionability, incompetency and fraud. First, respondent argues that unconscionability has never been recognized as a proper reason for granting this type of equitable relief. Although he admits that incompetency and fraud are valid grounds, respondent further argues that neither ground is a legitimate basis for rescission in this particular case. Specifically, he bases the second portion of this argument on his contention that the petitioner failed to introduce sufficient evidence to establish that Mrs. Neprozatis was incompetent at the time she entered into the agreement with him and that the trial court struck all of the fraud allegations from petitioner's complaint.

■■■ It is true that unconscionability is not generally recognized as a traditional ground for rescission. (See generally 17A C.J.S. *Contracts* 417-21 (1963).) We also agree that incompetency is not a proper basis for the trial court's judgment. As was stated in the recitation of the facts, Mrs. Neprozatis was not adjudicated incompetent until May 4, 1977, a month after the last repair was made to her home. The incompetency of Mrs. Neprozatis on May 4, 1977, does not prove her incompetency prior to that date. The burden of proving mental incapacity at the time of a transaction, which takes place prior to an adjudication of incompetency, is upon the party who seeks to set aside the transaction. (See *Lilly v. Waggoner* (1862), 27 Ill. 395, 397.) Persons of mature age are presumed to be sane (see *Titcomb v. Vantyle* (1877), 84 Ill. 371, 373) and mental incompetency cannot be inferred merely from old age. (See *White v. White* (1st Dist. 1960), 28 Ill. App. 2d 19, 27, 169 N.E.2d 839, 844.) Since

petitioner did not introduce any evidence relating specifically to Mrs. Neprozatis' mental state while dealing with White, petitioner failed to sustain her burden of proof.

However, contrary to respondent's contention, the trial court did not strike all of the fraud allegations in petitioner's complaint. For example, this paragraph was allowed to stand:

> "10. That in support of petitioner's allegations that the Respondent cheated the Ward, the court's attention is called to Exhibit A. For his records, White could produce no invoice for purchasing the heating unit. Instead, respondent produced a page out of the catalogue. White testified that he paid $320.00 for the furnace and $100.00 to install it. Amazingly and inexplicitly, for the lead in selling the furnace [White's words were, 'setting up the sale'] almost $1,000 was paid in commissions. An arms length transaction between competent individuals could reasonably yield respondent a 100% profit, but the profit of White is so unreasonable as to infer total FRAUD on his part."

Although this averment may not be drawn in an artful manner, it clearly accuses White of fraudulent conduct. (See Ill. Rev. Stat. 1977, ch. 110, par. 4; *Fleshner v. Copeland* (1958), 13 Ill. 2d 72, 77, 147 N.E.2d 329, 332.) Consequently, the trial court acted properly when it considered evidence relative to this allegation and when it drew inferences therefrom.

■■■ The central question, therefore, is whether White was guilty of fraud in his business dealings with Esther Neprozatis. Actual fraud is any false representation of a material fact made with knowledge of its falsity and with intent that it be acted upon and which is acted on to the injury of the other contracting party. (*Pustelniak v. Vilimas* (1933), 352 Ill. 270, 275, 185 N.E. 611, 614. See also 37 Am. Jur. 2d *Fraud and Deceit* §4(1968).) However, fraud can also be inferred from the relationship of the parties or from the surrounding circumstances regardless of any actual dishonesty of purpose. (*Federal Life Insurance Co. v. Griffin* (1st Dist. 1912), 173 Ill. App. 5, 17.) This type, which is called "constructive fraud," is defined as any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence. It requires neither actual dishonesty nor intent to deceive, being a breach of legal or equitable duty which, irrespective of the moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others. (*Federal Life Insurance Co. v. Griffin.* See also *Loucks v. McCormick* (1967), 198 Kan. 351, 356, 424 P.2d 555, 559; 37 Am. Jur. 2d *Fraud and Deceit* §4 (1968).) Fraud will vitiate a contract, making it voidable at the option of the defrauded party. *Hustad v. Cerny* (1926), 321 Ill. 354, 360, 151 N.E. 871, 874.

■■ The trial court held that the amount charged by White for making the repairs to Mrs. Neprozatis' home constituted constructive fraud. After having carefully examined the record, we are of the opinion that this finding is amply supported by the evidence adduced during the trial. We base this determination in part on the excessive nature of respondent's charges. For example, petitioner's expert witness testified that if White's subcontractors had done their work properly, the maximum charge should have been no more than $4,000. If we use this valuation of White's services, it indicates that respondent received at least a $21,000 profit since he obtained more than $25,000 from Neprozatis. Even if we consider White's testimony to be credible, it reveals that he made a profit of $1980 on the installation of the furnace and a gain of nearly $16,000 on the entire undertaking. As a result of this testimony and in view of the fact that White did none of the repair work himself, we must conclude that this profit margin is so gross as to shock the conscience, and that for this reason it constitutes a constructive fraud which, if not corrected, carries with it all the injurious consequences that would normally flow from an intentional design to perpetrate an actual fraud. See generally *People ex rel. Rhodes v. Turk* (1945), 391 Ill. 424, 427-29, 63 N.E.2d 513, 514-15.

In this regard we must also conclude that White and Mrs. Neprozatis did not deal with each other at arm's length during this transaction. "What constitutes undue influence is a question depending upon the circumstances of each particular case* * *. [I]t is a species of constructive fraud which the courts will not undertake to define, by any fixed principle, lest the very definition itself should furnish a finger-board pointing out the path by which it may be evaded,* * *." (17 Am. Jur. 2d *Contracts* §154 (1964).) This treatise goes on to say in the same section:

> "Whenever the relationships between the parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that unfair advantage in a transaction is rendered probable either because of superior knowledge of the matter derived from a fiduciary relationship or from overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side, the presumption is that the transaction is invalid, and it is incumbent on the stronger party to show affirmatively that no deception was practiced or undue influence used and that every thing was fair, open, voluntary, and well understood."

See also *Eichhorst v. Eichhorst* (2d Dist. 1929), 252 Ill. App. 575, 581, *aff'd*, 338 Ill. 185, 170 N.E. 269 (1930); 17 C.J.S. *Contracts* §§180, 184 (1963).

Certainly there was no fiduciary relationship between the respondent and Mrs. Neprozatis. Nevertheless, it was established that Neprozatis was

an 81-year-old widow at the time of this transaction and that White had 22 years of prior experience in the heating and cooling business. Since this evidence suggests that the respondent had an advantage over Neprozatis in that he had a superior knowledge of heating and cooling problems, we believe that under these circumstances Mrs. Neprozatis was justified in placing her trust in White regarding home improvements of this kind. However, White has made no attempt to demonstrate that everything was open, voluntary and well understood on Mrs. Neprozatis' part. On the contrary, respondent's undue influence is clearly evidenced by the fact that White and his subcontractors drove Neprozatis to two savings and loans where she withdrew from her accounts any amount they requested; that she gave White $7,489 before any work was begun in her home; that she had the respondent put in a central air conditioning unit when the temperature outside was 20 degrees below zero; and that she paid extremely high charges without complaint.

Additionally, several items of evidence tend to indicate that the respondent intentionally misrepresented the condition of the heat exchanger after he had examined it. White's destruction of the old furnace tends to make him suspect. This suspicion is strengthened by the fact that petitioner and Mrs. Neprozatis' daughter-in-law testified that Neprozatis' home was always warm during the winter; that there had never been a flood in her house; and that they had never smelled hydrogen sulfide gas on the premises. Furthermore, the daughter-in-law stated that Mrs. Neprozatis had a gas fired refrigerator in her home and she indicated that this appliance had been operating satisfactorily for over 37 years. The inescapable conclusion that must be drawn from this testimony is that the halogenated hydrocarbons present in the atmosphere of Mrs. Neprozatis' home could not have had a damaging effect on the heat exchanger of her furnace. For the foregoing reasons, the trial court's order of rescission will be affirmed.

We note but do not consider respondent's other arguments concerning the propriety of the rescission order since we find them to be without merit.

Respondent contends that, even if the trial court's judgment order is upheld, he is entitled to an offset from the judgment equal to his actual costs and expenses. He also asserts that he is entitled to a reasonable profit. We are in partial agreement with this contention.

■■ One induced to contract through the fraud of another may at his election rescind the contract and recover the consideration that he has paid or affirm the contract and recover the difference between the property received and what he would have received but for the fraud. (*Siltz v. Springer* (1908), 236 Ill. 276, 277-78, 85 N.E. 748, 749.) However, if the defrauded party elects to rescind, he must also place the other party

in statu quo by restoring the property that he has accepted. *Hustad v. Cerny.*

■■ In view of this precedent, we feel that respondent is entitled to have the judgment further reduced by an amount equal to the cost of the materials used by the subcontractors in repairing Mrs. Neprozatis' house. Petitioner's expert witness testified that these materials had a retail value of $1,539.70. Since petitioner's expert also testified that all the work will have to be redone, White is not entitled to recover the cost of labor or the cost of the subcontractors' commissions. In addition, a person who is adjudged guilty of fraud is not entitled to a profit.

Since it is the opinion of this court that the trial court's order of rescission is supported by the manifest weight of the evidence, it will be affirmed. However, for the aforementioned reasons the amount of this judgment is reduced to $23,549.30. Ill. Rev. Stat. 1977, ch. 110A, par. 366(a)(5).

Judgment affirmed as modified.

DOWNING and BROWN, JJ., concur.