Endurance Paving Company, an Illinois Corporation, Plaintiff-Counterdefendant-Appellee, v. Peter Pappas and William Pappas, d/b/a Red Fox Restaurant, Defendants-Counterplaintiffs-Appellants.

**Gen. No. 53,041.**

First District, First Division.

November 24, 1969.

James N. Kosmond, of Chicago (Boodell, Sears, Sugrue & Crowley, of counsel), for appellants.

Ash, Anos and Harris, of Chicago (Ben Goldwater, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

Plaintiff, Endurance Paving Company, sued for $995, an alleged balance due it for paving done for defendants. Defendants answered and counterclaimed for $4,000 damages on the ground that the paving was not in accordance with specifications and was not done in a workmanlike manner. Defendants appeal from a judgment entered on a jury verdict in favor of plaintiff on both the complaint and the counterclaim. On appeal defendants assert prejudicial trial errors and improper jury instructions.

In 1961, the defendants, Peter and William Pappas, were partners in the operation of the Red Fox Restaurant. They accepted a proposal dated October 4, 1961, submitted on behalf of plaintiff Endurance, for the asphalt paving of two parking lots serving the restaurant. The proposal of Endurance included specifications for

the materials to be used (eight inches of stone and three inches of asphalt) and for its installation.

Paul Shackelford, president of Endurance, testified that about ten days after the acceptance of the proposal he received a telephone call from Peter Pappas advising that the excavator was there and requesting him to come out and check the grading. He said that on the day he went to the site, it started to rain. This condition continued for a time, which delayed the completion of the excavation for a few days, and when plaintiff arrived to commence work the excavator was just finishing up. Because of the wet and muddy conditions, Shackelford said he recommended that the paving be postponed. The Pappases told him that "they couldn't operate the restaurant if they didn't get the paving in and since the season was almost at an end they couldn't afford to wait, we would have to go ahead the way it was." He was sure that the work was commenced before the end of October, 1961.

Shackelford also testified as to the installation. The areas that were not too wet were rolled and prepared to receive stone. After the stone was laid, they applied one inch of binder and one inch of surface asphalt. Thereafter it was rolled and compacted. After rolling the lines out, the job was completed.

Shackelford further testified that a wet or muddy subgrade will not cause depressions in the finished asphalt, but he stated that it might cause cracks or breaks in the asphalt "like a boil that blows up and breaks it out." Depression could be caused from a soft or bad fill underneath the stones, but he did not consider the subgrade of these particular lots to be bad.

On cross-examination Shackelford repeated that the total asphalt laid was two inches. He also said that during the two-week period of time the job took, he had several conversations with the Pappases. He recalled

that "every day we were out there I told them that it was too wet to work in the rain." On rebuttal, and over defendants' objection, the trial judge permitted him to testify that a total of three inches of asphalt was installed.

Plaintiff's witnesses included an asphalt salesman, who visited the job site in November of 1961. While he was there he was introduced to William Pappas by Paul Shackelford. During a subsequent conversation between the three of them, he said that he advised not putting the asphalt wearing surface on the binder until spring because of the "condition of the base . . . the weather, and the lateness of the paving season," and William Pappas said that he "wanted the job completed."

Another witness for plaintiff testified that for twelve years he had been connected with thousands of jobs where asphalt had been laid. He had examined the parking lots in early June of 1967 and in his opinion the depressed areas he found had been in existence for approximately two years. He attributed the depressed and cracked condition to settlement of the asphalt. He gave an estimate as to the repairs needed and the cost thereof. His examination of the premises consisted of a visual examination. He took no measurements nor made any tests.

Defendant William Pappas testified that he called Shackelford on October 23, 1961, to ask him when he could have his equipment available to commence work. He said Shackelford promised that they would begin the installation on Wednesday, October 25, 1961. Based on this, Pappas arranged to have Charles Lenz & Co. excavate the lots on the following day. The excavating was completed on the following morning in anticipation of Endurance starting paving that day. Plaintiff's work did not start because plaintiff's equipment did not arrive until the following week. A period of heavy rain

occurred during the interim, between the completion of the excavation and the arrival of plaintiff's equipment.

William Pappas further testified that he was at the job site when the plaintiff company was putting in the heavy crushed stone. He stated that Shackelford said nothing about the subgrade being too wet for them to do the work. He stated that there was only one rolling instead of the two rollings that were required, and that as the rolling was being done, the stone was being churned with mud. He complained to Paul Shackelford that the heavy stones were not being installed in two rollings as required by the contract and was told that if they "have any defects, we will take care of it; we will put plenty of stone on." While the final rolling was being accomplished, depressed areas in the asphalt began to appear. He mentioned this to Paul Shackelford and was informed that plaintiff would take care of it in the spring, which was never done. In December of 1961, shortly after receiving the statement from the plaintiff in the sum of $6,995.85, he again mentioned the depressions and cracking in the asphalt to Paul Shackelford, who promised to take care of it if he got a substantial payment on account. The sum of $5,000 was paid to plaintiff on February 16, 1962, and $1,000 on April 26, 1962.

Defendants' witnesses included an engineering consultant for the remodeling of the restaurant, who inspected the work done by plaintiff on the two parking lots on or about November 30, 1961, which was shortly after its completion. He related in detail his findings, and he estimated the cost of adequate repairs would be $3,620.

Another witness for defendants, Paul Flood, a licensed engineer and a specialist in the analysis of construction materials, with 15 years' experience in the asphalt field, examined the parking lots on April 21, 1965, and found that approximately one-third was badly cracked and had depressional markings indicating

waviness. He made six core borings in the asphalt. After he examined the borings they were transferred to a laboratory for further inspection and testings by technicians under his supervision. He was permitted to testify as to what the borings showed him. He was not permitted to testify as to the results of the tests by the technicians on the ground that since the tests were made by technicians his answers would be hearsay.

Defendants' witness Flood was subsequently asked a series of hypothetical questions, to which the court sustained plaintiff's continued objection that the hypothetical questions contained facts which were not introduced in evidence in the trial. Secondly, the hypothetical questions asked for a conclusion or opinion of the witness at a time in 1965, which was unrelated to the time of the installation in 1961.

After considering this record, we have concluded that the determinative issue is whether the jury was properly instructed. "Where a case is close on the facts, and its decision depends and must be determined upon conflicting testimony, the jury should be adequately and accurately instructed." Both v. Nelson, 31 Ill2d 511, 515, 202 NE2d 494 (1964).

Defendants specifically complain that the giving of plaintiff's instruction No. 4 was prejudicial and improper. It provided:

> "The Court instructs the jury that if you fail to find from the evidence that any defects in the parking lots of the Defendants-Counterplaintiffs were caused by the Plaintiff-Counterdefendant and that the work of the Plaintiff-Counterdefendant was not done in accordance with the specifications then the jury will find for the Plaintiff-Counterdefendant and against the Defendants-Counterplaintiffs' on the Defendants-Counterplaintiffs' Counterclaim."

Defendants argue that this instruction was repetitious in the light of IPI instruction 21.04, as adapted, which had already been given, providing:

"In order for the defendants to recover on their counterclaim, the defendants have the burden of proving each of the following propositions:

"1. That the work performed by plaintiff did not conform to the specifications of the written contract between the parties or that the work performed by the plaintiff was not done in a good workmanlike manner.

"2. That as a result thereof there were defects for which the defendants will be required to expend additional sums of money to repair.

"3. The fair reasonable market price of such repairs.

"If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the defendants as to their counterclaim. On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the plaintiff as to the defendants' counterclaim."

■■■■■ We agree with defendants that it was prejudicially erroneous to give instruction No. 4. It was a second burden of proof instruction, and "a rule of law once clearly stated to the jury is enough and should not be repeated." (Ryan v. Monson, 33 Ill App2d 406, 424, 179 NE2d 449 (1961).) It contained an incorrect statement of the law because it in effect instructed the

jury that they must find for the plaintiff unless they found plaintiff caused the defects and that the work was not done according to specifications, while the law is that plaintiff's work must not only comply with the specifications but also be done in a workmanlike manner. (Masters v. Central Illinois Electric & Gas Co., 7 Ill App2d 348, 364, 129 NE2d 586 (1955).) The effect of instruction No. 4 was to remove the issue of workmanlike performance from the case; also it was peremptory in form and failed to contain all the facts and was not complete within itself and could not be cured by other instructions in the series. (Duffy v. Cortesi, 2 Ill2d 511, 119 NE2d 241 (1954).) Finally, because IPI instruction 21.04, as adapted, allowed the jury to find for defendant if *either* failure to conform to specifications or lack of workmanlike performance was shown, the necessary effect of instruction No. 4 was to confuse the jury.

We have not discussed defendants' other contentions of prejudicial trial errors based upon the court's rulings on evidence, hypothetical questions and the propriety of the rebuttal testimony of plaintiff as to the depth of the asphalt installed. The guidelines in these areas are numerous and undoubtedly these alleged trial errors will not recur during a new trial.

For the reasons given, the judgment appealed from is reversed and the cause is remanded to the Circuit Court for a new trial.

Reversed and remanded.

ADESKO, P. J. and BURMAN, J., concur.