508 F.Supp. 390 (1981)
The DANIEL HAMM DRAYAGE COMPANY, Plaintiff,
v.
The WALDINGER CORPORATION, Defendant and Third Party Plaintiff,
v.
W. E. O'NEIL CONSTRUCTION COMPANY; EIE Company, Inc., Denver Equipment Division; FMC Corporation; and Detroit Stoker Co., Third Party Defendants.
No. 79-47 C (4).
United States District Court, E. D. Missouri, E. D.
April 9, 1981.
*391 *392 Justin C. Cordonnier, Thomas E. Wack, Edwin L. Noel, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for plaintiff.
Stephen H. Rovak, Gallop, Johnson, Godiner, Morganstern, & Crebs, St. Louis, Mo., for Waldinger Corp.
Dennis C. Donnelly, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., John A. Relias, Chicago, Ill., for W. E. O'Neil Co.
Steven P. Sanders, St. Louis, Mo., for FMC Corp.
Henry D. Menghini, Evans & Dixon, St. Louis, Mo., for EIE.
John A. Templer, Jr., Des Moines, Iowa, for Detroit Stoker Co.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court for a decision on the merits following a four-day bench trial commencing on January 19, 1981. Plaintiff brings this diversity action seeking to recover damages arising from alleged fraudulent inducement to enter into a construction contract. Defendant asserts a counterclaim for the cost of corrections on plaintiff's work; third-party claims for indemnification against third party defendants W. E. O'Neil Construction Company and FMC Corporation; and a third-party claim for damages against W. E. O'Neil Construction Company.
Having considered the pleadings, trial testimony and exhibits, stipulations of the parties, briefs, and applicable law, and being otherwise fully advised in the premises, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff Daniel Hamm Drayage Company [Hamm] is a Missouri corporation with its principal business offices in St. Louis, Missouri. Hamm is engaged in business as a commercial erector, rigger, millwright, machinery mover, and carrier of heavy equipment.
2. Defendant and third party plaintiff The Waldinger Corporation [Waldinger] is a mechanical contracting firm incorporated in Iowa, with its headquarters in Des Moines, Iowa.
3. Third party defendant W. E. O'Neil Construction Company [O'Neil] is an Illinois general contracting corporation with its principal place of business in Chicago, Illinois.
4. Third party defendant FMC Corporation [FMC] is a Delaware corporation with its principal place of business in Illinois.
5. Waldinger's third party complaint against Detroit Stoker Company was dismissed for lack of personal jurisdiction by this Court's Order dated March 21, 1980. Waldinger's third party complaint against Engineered Industrial Equipment Company [EIE] was dismissed for lack of personal jurisdiction by this Court's Order dated May 21, 1980.
6. In 1976, the Caterpillar Tractor Company [Caterpillar] entered into a general construction contract with O'Neil for the *393 construction of foundry buildings and a pollution control facility in Mapleton, Illinois. In early 1976, O'Neil entered into a subcontract with Waldinger for the mechanical portion of the general contract.
7. Pursuant to Waldinger's contract with O'Neil, Waldinger was to provide for the design, construction, and erection of certain pollution control equipment.
In April, 1976, Waldinger hired FMC to design and construct pollution control equipment principally consisting of large clarifier tanks and operating mechanisms for use inside the tanks. Waldinger later hired Hamm to rig and assemble the FMC equipment.
8. Waldinger's contract with FMC provided for delivery of various items within a specified number of weeks following final approval of the design drawings by Waldinger and Caterpillar. For example, the internal mechanisms for the clarifier tanks were to be delivered forty-six weeks following design approval. Waldinger approved FMC's design drawings in October, 1976; delivery was therefore projected for September, 1977.
9. By March of 1977, Waldinger was behind schedule on its portion of the Mapleton project. O'Neil urged Waldinger to begin erection of the pollution control equipment, some of which was already at the job site.
10. At all relevant times herein, Gary Nicholls was the Waldinger executive responsible for the Mapleton project. Greg Roth was Waldinger's manager of purchasing. At Nicholls' direction, Roth contacted Dave Garrett, then vice president and chief estimator for Hamm, to negotiate for the erection of the pollution control equipment.
11. Roth and Garrett met in Des Moines, Iowa, in March, 1977. Roth indicated to Garrett that some of the equipment to be erected had already arrived at the job site, and that Waldinger was eager for erection of the equipment to begin as soon as possible. Roth further advised Garrett that equipment deliveries would be occurring throughout the project, but that all equipment would be delivered no later than July 25, 1977.
12. Although Roth provided Garrett with Caterpillar's specifications, Roth did not provide Garrett with a copy of Waldinger's contract with FMC. The FMC/Waldinger contract contained modifications on the Caterpillar specifications. For example, Waldinger's contract with FMC excluded the services of an FMC erection supervisor, although an erection supervisor was required by the Caterpillar specifications.
13. Although Roth had previously been advised by FMC that all equipment would not be on site until September of 1977, Roth failed to so advise Garrett at the March of 1977 conference.
14. Relying on Roth's representations as to the equipment delivery schedule, the availability of an FMC erection supervisor, and the match-marking of FMC's equipment, Garrett estimated that Hamm could complete work on its portion of the project within eighteen consecutive work weeks. Roth and Nicholls concurred in this estimate, and Garrett prepared a bid accordingly.
Garrett advised Roth that Hamm could begin work immediately. Based upon Roth's representations as to the delivery schedule, Garrett anticipated that the remainder of the FMC equipment would be delivered to the job site by the time Hamm completed work on equipment already at the site.
15. In April, 1977, following negotiations, Waldinger accepted Hamm's bid in the sum of $174,850. At the request of Jim Tippery, Waldinger's chief field representative for the Mapleton project, Hamm manned the project within a few days of Waldinger's acceptance of Hamm's bid. Therefore, Hamm expected to complete work on the project in mid-August of 1977.
16. An equipment delivery schedule is material to the preparation of a bid on a construction project. Work scheduling and labor costs, and considerations relative to weather conditions, are all relevant to the preparation of a bid, and are all affected by the equipment delivery schedule.
*394 17. But for Waldinger's representations as to the delivery schedule for the FMC equipment, Hamm would not have bid for the project when and as it did.
18. On June 9, 1977, Nicholls wrote a letter to FMC, confirming a telephone conversation wherein FMC had advised Nicholls that the FMC equipment would not be delivered to the job site until late October of 1977.
Garrett received a copy of Nicholls' letter. In response to Garrett's subsequent complaints regarding the delays in deliveries, Tippery advised Garrett that Waldinger was insisting on, and expected delivery earlier than October.
19. Final deliveries of the FMC equipment were not completed until late December of 1977. Hamm had left the job site on December 7, 1977, due to extreme weather conditions and returned to the site in early January of 1978. The mid-winter deliveries resulted in further delays; Hamm did not substantially complete work on the project until April of 1978.
20. Due to delivery of the FMC equipment five months later than had been originally represented, Hamm incurred expenses in the sum of $269,294. Hamm acknowledges receipt of $157,296, paid by Waldinger during the course of the project. Therefore, Hamm has incurred expenses in excess of its compensation in the sum of $111,998.
21. After Hamm left the job site in April of 1978, it became apparent that the center columns in three clarifier tanks erected by Hamm were out of plumb. Further, Hamm had failed to install leveling nuts beneath the center column platforms, as required by the design drawings.
Hamm refused Waldinger's request that Hamm return to the job site to make the necessary adjustments. Waldinger thereafter hired V. Jobst & Sons to perform corrective work on Hamm's portion of the project.
22. By its counterclaim, Waldinger seeks to recover $39,951, which represents the cost of securing performance of the corrective work by V. Jobst & Sons.
23. In Count II of its third party complaint, Waldinger seeks to recover from O'Neil for damage to a pipe laid by Waldinger in a trench adjacent to a road graded by O'Neil. The pipe was damaged as a result of flooding in the pipe trench following a five-inch rainfall.
24. The road adjacent to the pipe trench was graded sloping towards the trench. The Court finds, however, that directing the slope away from the trench was impracticable; the slope would have then been directed towards buildings under construction.
The Court further finds that, in light of the confined work area, and the ongoing construction of buildings adjacent to the road graded by O'Neil, the evidence was insufficient to establish that O'Neil improperly graded the road adjacent to the pipe trench.
The Court further finds that Waldinger failed to take preventive steps designed to avoid damage to the pipe from flooding, e. g., covering the open ends of the pipe at the close of the work day. By reason of the foregoing, the Court cannot conclude that the water damage to Waldinger's pipe was caused by the manner in which O'Neil graded the adjacent road.

Conclusions of Law
1. This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1332.
2. Plaintiff brings this action seeking to recover losses allegedly sustained as a result of defendant's fraudulent representations regarding an equipment delivery schedule to an Illinois construction site.
A threshold question before the Court is the determination of the law to be applied in this cause. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
In a diversity action alleging fraud, the tort conflict of laws rules of the forum control the determination of which state's substantive law applies. General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1216 (8th Cir. 1973), cert. denied, 414 U.S. 1162, *395 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); Klaxon v. Stentor Elec. Mfg. Co., supra, 313 U.S. at 496, 61 S.Ct. at 1021.
Missouri has adopted the "most significant contacts" approach of the Restatement (Second) on Conflict of Laws, §§ 6 and 145. Griggs v. Riley, 489 S.W.2d 469, 472-73 (Mo.App.1972). The inquiry is focused on policy considerations designed to gauge the relative interests of the forum state as compared to the state which has the most significant contacts with the cause of action. Id. In a close case, the law of the place of the tort controls. Id.
3. In the instant case, the allegedly fraudulent representations were made at defendant's corporate offices in Iowa, to representatives of a Missouri corporation regarding deliveries to be made to an Illinois job site.
Although preliminary negotiations occurred in Iowa, the relationship of all the parties, including the third party defendants, was centered in Illinois. See W. Newspaper Union v. Woodward, 133 F.Supp. 17, 23 (W.D.Mo.1955), holding that in cases of fraudulent misrepresentation, it is not the law of the state where the misrepresentations were made, but rather the law of the state where the misrepresentations were intended to, and did, operate to cause the loss that controls the tort. Therefore, the Court concludes that Illinois law should be applied.
4. To recover for fraud, plaintiff must establish that defendant knowingly made a false representation of a material fact intending that plaintiff act upon the representation. Plaintiff must further establish a right to rely on defendant's representations, actual reliance, that such reliance was reasonable, and that by reason thereof, plaintiff was damaged. In Re Estate of Neprozatis, 62 Ill.App.3d 563, 19 Ill.Dec. 470, 378 N.E.2d 1345, 1349 (1978); Tcherepnin v. Franz, 393 F.Supp. 1197, 1216 (N.D.Ill.1975), aff'd, 570 F.2d 187 (7th Cir.), cert. denied sub nom. First Nat. Bank & Trust Co. v. Berke, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).
A false representation may be express or may be implied by the nondisclosure of a material fact. Id.; St. Louis U. Trust Co. v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 562 F.2d 1040, 1054 n.21 (8th Cir. 1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).
5. The equipment delivery schedule was a material consideration in Hamm's evaluation of the project and preparation of Hamm's bid. Nevertheless, Waldinger failed to advise Hamm of the actual projected delivery schedule during the course of the contract negotiations.
Hamm's reliance on Waldinger's representations as to the delivery schedule was clearly reasonable; the delivery schedule was dependent in part upon Waldinger's approval of equipment design drawings. Hamm relied on Waldinger's representations as to the delivery schedule in preparing a bid, and, by reason thereof, was damaged in the sum of $111,998.
The Court concludes that Hamm has established each of the elements of fraud by sufficiently clear and convincing evidence. Borowicz v. Chicago Mastic Co., 367 F.2d 751, 760 (7th Cir. 1966).
6. Where fraud in the inducement is established, the defrauded party may avoid the contract by timely election made promptly upon discovery of facts from which the right to avoid the contract arises. United Forest Products Co. v. Baxter, 452 F.2d 11, 16 (8th Cir. 1971); W. Cas. and Sur. Co. v. Herman, 318 F.2d 50, 55 (8th Cir. 1963); Lichter v. Goss, 232 F.2d 715, 720 (7th Cir. 1956).
7. Delivery delays in the construction industry, standing alone, do not provide a sufficient basis for inferring fraud.
The evidence relative to Hamm's discovery of facts indicative of fraud was insufficient to establish Hamm's intentional waiver of the right to avoid the contract. See United Forest Products Co. v. Baxter, supra.
The Court having found that Hamm was fraudulently induced to enter into the *396 contract with Waldinger, and having found no waiver of Hamm's right to rescind the contract, the contract between Hamm and Waldinger will be deemed rescinded. The terms of the contract, including the "no pay for delay" provisions on which Waldinger relies, will be given no effect.
The Court having determined that the contract is rescinded, Hamm's claims based on Waldinger's alleged breach, or repudiation of the contract by actively interfering with Hamm's performance, will be dismissed with prejudice.
8. Damages resulting from fraud are properly measured by the injury to the defrauded party. Fairfield Sav. & Loan Ass'n v. Kroll, 106 Ill.App.2d 296, 246 N.E.2d 327, 332 (1969).
The Court finds that in the instant case, Hamm's damages are properly measured by the amount of expenses incurred less the amount of compensation received. See Scholz Homes, Inc. v. Larson, 411 F.2d 342, 349 (7th Cir. 1969); Madigan, Inc. v. Goodman, 357 F.Supp. 1331, 1355 (N.D.Ill. 1973), aff'd in part, rev'd in part on other grounds, 498 F.2d 233 (7th Cir. 1974). Therefore, judgment will be entered in favor of Hamm in the sum of $111,998.
9. Hamm further seeks to recover for lost profits and overhead. The Court concludes, however, that such items are not properly recoverable in a fraud action. Scholz Homes, Inc. v. Larson, supra, 411 F.2d at 348; see Albert v. Kopplin Molding Corp., 247 F.2d 107, 110 (8th Cir. 1957), holding that no right to recover lost profits exists following rescission of a contract.
10. Waldinger counterclaims against Hamm for the cost of corrective work on clarifier tanks erected by Hamm. The Court has found that Hamm failed to erect three clarifier tanks according to specifications and in a workmanlike manner. Endurance Paving Co. v. Pappas, 117 Ill. App.2d 81, 253 N.E.2d 895, 898 (1969); Watson Lumber Co. v. Guennewig, 79 Ill.App. 377, 226 N.E.2d 270, 280 (1967). Judgment will be entered in Waldinger's favor on the counterclaim in the sum of $39,951.
11. In Count I and Count III of its third party complaint, Waldinger alleges that third party defendants O'Neil and FMC may be responsible for delays or other acts which caused Hamm to incur damages. Waldinger seeks recovery from O'Neil and FMC for any damages attributable to the conduct of third party defendants.
At the close of all the evidence, the Court held that neither O'Neil nor FMC would be liable to Waldinger provided that the Court found Waldinger liable for fraud, because neither O'Neil nor FMC participated in the fraud.
The Court having found Waldinger to be liable for fraud in the inducement, Count I and Count III of Waldinger's third party complaint will be dismissed with prejudice.
12. By Count II of Waldinger's third party complaint, Waldinger seeks to recover against O'Neil for alleged damage to a pipe laid by Waldinger. The Court having found the evidence to be insufficient to establish that O'Neil improperly graded the road adjacent to the pipe trench, Count II of Waldinger's third party complaint will be dismissed with prejudice.
By reason of the foregoing, judgment will be entered in favor of plaintiff and against defendant in the sum of $111,998, and in favor of defendant and against plaintiff on defendant's counterclaim in the sum of $39,951. Third party plaintiff's complaint will be dismissed with prejudice.