**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Ignacio P. GODINEZ, Defendant–
Appellant.**

**No. 96–2657.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1997.

Decided March 27, 1997.

---

Ranley R. Killian, Jr., Robert Coleman (argued), Office of United States Attorney, Criminal Division, Fairview Heights, IL, for plaintiff–appellee.

David S. Mejia (argued), Chicago, IL, for defendant–appellant.

Before BAUER, FLAUM, and EVANS, Circuit Judges.

BAUER, Circuit Judge.

A jury convicted Ignacio P. Godinez of one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Godinez to two concurrent 97–month prison terms. On appeal, Godinez challenges the sufficiency of the evidence, the admission of certain testimony at trial, and the application of a sentence enhancement. Finding no merit to any of Godinez's claims, we affirm.

## BACKGROUND

Godinez was the subject of a cocaine conspiracy investigation by the FBI that began on March 30, 1995. The investigation was spurred by the FBI's arrest of Bruce Hileman at the Jackson County Airport. Hileman had 117.5 grams of cocaine in his possession. At the time of his arrest, Hileman agreed to cooperate with the FBI. While explaining the operation of the conspiracy, he described meeting times and places and gave up names, including that of Godinez.

Hileman was at the low end of the conspiracy. He would travel to Chicago to purchase distribution quantities of cocaine to take back to southern Illinois. In 1993, when Hileman first became involved in the conspiracy, Dale St. Arbor served as his cocaine source. St. Arbor obtained cocaine from Raphael Oquendo (also known as "Rico"), who, in turn, obtained it from Godinez (also known as "Nacho" or "Notso"). In late 1993, St. Arbor was cut out of the conspiracy, and Oquendo became Hileman's source. Godinez still supplied cocaine to Oquendo and, on several occasions, sold cocaine directly to Hileman. From August 1994 to March 30, 1995, Hileman traveled to Chicago ten to fifteen times, each time purchasing between two and six ounces of cocaine from either Oquendo or Godinez for distribution in southern Illinois. When the deals were set up, Hileman would tell Oquendo that he wanted a certain number of "rings," meaning ounces of cocaine. (Coincidentally, perhaps, Godinez is also a jewelry salesman.)

Between March 30, 1995 and April 6, 1995, Hileman, per instructions of the FBI, called Oquendo to arrange to purchase $20,000 worth of cocaine. Oquendo then contacted Godinez, who told Oquendo that $20,000 would buy twenty-one ounces of cocaine, two of which would be "cut." The deal was then set to take place on April 6, 1995 at a hotel in Effingham, Illinois.

On the morning of April 6, Godinez and Oquendo traveled together in Godinez's station wagon from Chicago to Effingham. According to Oquendo, he did not know where the cocaine was located until Godinez pointed to where he had hidden it. Once in Effingham, Godinez dropped off Oquendo at the hotel, where Hileman was waiting in Room 123. Surveillance agents were in the next room, watching and listening to the events in Room 123 and scanning the hotel's parking lot. The deal was not audio-recorded due to equipment failure.

When Oquendo entered the room, Hileman handed him $20,000. Soon after, Godinez entered the room, spoke to Oquendo in Spanish, and then left the room while Oquendo counted the money. Godinez drove his station wagon out of the surveillance agents' view and, about eight minutes later, returned to Room 123 carrying a bag. Godinez reached into the bag and pulled out two bundles that were wrapped in plastic and duct tape and attached to a coat hanger. Each bundle contained two interior Ziploc-type bags filled with cocaine. Godinez handed the cocaine to Hileman and explained (through Oquendo's translation) that the bundles of cocaine were broken down into "five and five and five and six"—totaling 21 ounces, the amount that Hileman, Oquendo and Godinez previously had agreed upon. Godinez and Oquendo left the room after the transfer was complete, whereupon awaiting

agents arrested them. The agents seized Godinez's bag, which contained pieces of jewelry, jewelry magazines, jewelry tools, and other items related to jewelry sales.

Godinez's fingerprint was lifted from one of the interior Ziploc-type bags containing cocaine. There was testimony at trial that the bag could not have been touched after it was wrapped in the exterior packaging.

Oquendo pleaded guilty to conspiracy to distribute and possession with intent to distribute cocaine. Hileman pleaded guilty to possession of cocaine and conspiracy to deliver cocaine. A jury found Godinez guilty of one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). At Godinez's sentencing hearing, the court determined that his base offense level was 28, pursuant to a stipulation that the amount of cocaine possessed and distributed during the conspiracy was more than 3 kilograms, but less than 3.5 kilograms. The court applied a two-level enhancement for obstruction of justice, pursuant to § 3C1.1 of the Sentencing Guidelines, giving Godinez a total offense level of 30. This offense level, combined with a criminal history category of I, produced a sentencing range of 97 to 121 months' imprisonment. The court sentenced Godinez to 97 months on each count, the sentences to run concurrently. On appeal, Godinez argues (1) that the evidence presented at trial was insufficient to sustain his conviction; (2) that the district court erred by admitting hearsay and "prior bad acts" evidence at trial; and (3) that the district court erred by applying a sentence enhancement for obstruction of justice.

## ANALYSIS

### A. Sufficiency of the Evidence

Godinez would have us believe that he accompanied Oquendo to Effingham on April 6, 1995 merely to sell jewelry to Hileman; that he was in the wrong place at the wrong time when Oquendo and Hileman executed their drug deal. The evidence, however, indicates otherwise.

We review the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the Government and will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Jackson,* 103 F.3d 561, 567 (7th Cir.1996) (citation omitted). A conspiracy is "a confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Larkins,* 83 F.3d 162, 165 (7th Cir.1996) (citation omitted). In order to sustain a conspiracy conviction, the Government must provide substantial evidence that a conspiracy existed and the defendant knowingly agreed to join it. *Id.* at 166 (citation omitted). The Government may establish these elements through circumstantial evidence. *Id.* (citation omitted).

Godinez's conspiracy conviction is sufficiently supported by the evidence. First, there is Oquendo's testimony. Oquendo testified that he served as the middleman between Godinez and Hileman for approximately twenty-two drug transactions. On those occasions, Hileman called Oquendo to request a certain number of "rings"; Oquendo contacted Godinez to tell him what he needed; Godinez then "had everything ready." Godinez paid Oquendo for his role in setting up these deals—generally $75 to $100 per ounce plus a little cocaine for personal use. When Oquendo was unable to meet Hileman, Godinez personally sold cocaine to Hileman, although Oquendo still arranged the deals. Oquendo "gave [Godinez] the money all the time."

According to Oquendo's testimony, the April 6, 1995 controlled drug buy followed the usual routine. Hileman told Oquendo that he wanted $20,000 worth of cocaine. Oquendo, in turn, contacted Godinez to ask how much cocaine Hileman could get for that amount of money. Godinez responded that Hileman could get twenty-one ounces, two of which would be "cut." On the morning of April 6, Oquendo and Godinez drove together in Godinez's station wagon to Effingham. During the trip, Godinez pointed to the console and said, "That's it," referring to the cocaine. Godinez told Oquendo the cocaine

was attached to a coat hanger. In the hotel room, Hileman and Oquendo initially were alone. Hileman handed over the money to Oquendo. Godinez walked into the room, stayed briefly, then walked out of the room. He returned less than ten minutes later holding a bag. Godinez reached into the bag and grabbed a hanger that had two packages attached to it. He instructed Oquendo, in Spanish, to explain to Hileman how the cocaine was packaged. Oquendo, translating for Godinez, told Hileman that the packages contained "five and five and five and six."

Next, there is Hileman's testimony. He testified that on three or four occasions he bought cocaine directly from Godinez. Hileman also corroborated Oquendo's testimony relating to the April 6, 1995 controlled drug deal. He testified that Godinez went to his car, then returned with cocaine and stated that the hanger he was handing to Hileman contained "five and five on one end and five and six on the other end."

The events of April 6 were also substantially corroborated at trial by FBI Supervisory Special Agent Robert Dueker, who testified that he was able to see (on video) and hear the events that were occurring in Room 123. The video recording of the activity in Room 123 was shown in court.

Finally, as if Hileman's and Oquendo's testimony were not enough, physical evidence was presented at trial supporting Godinez's involvement in the April 6, 1995 controlled drug buy. Godinez's fingerprint was found on one of the interior Ziploc-type bags that contained cocaine. A member of the Federal Public Housing Drug Task Force testified that the bag could not have been touched once it was wrapped in the exterior packaging.

Given this evidence, the jury was justified in rejecting Godinez's claim that he was merely an unsuspecting jewelry salesman. The evidence amply supports Godinez's convictions.

### B. Objection to Statements Admitted at Trial

*1. Testimony Regarding Godinez's Prior Cocaine Dealing*

 Godinez challenges the district court's admission of part of Hileman's testimony in which Hileman recounted a statement made to him by St. Arbor before St. Arbor was cut out of the conspiracy. When asked whether he had heard of Godinez before September 1994 and if so, how he had heard of him, Hileman testified, "[St. Arbor] told me he dealt with Rico [Oquendo] and Notso [Godinez] with drugs and jewelry." [1] Godinez also challenges the admission of a portion of Oquendo's testimony. Oquendo stated that prior to the dates charged in the indictment (August, 1994 to April 6, 1995), Godinez supplied him with cocaine, which he, in turn, sold to Hileman.[2] Godi-

---

1. The full line of questioning was as follows:
 Q. With regard to Notso or Nacho, who you pointed to, who introduced you to him?
 A. Notso?
 Q. Uh huh.
 A. Rico did.
 Q. When did that occur?
 A. It was around August or September of '94.
 Q. Was that the first that you had heard of Notso or Nacho?
 A. No, I had heard of him before.
 Q. And how did you hear of him?
 A. Through another guy by the name of Dale St. Arbor.
 Q. What did Dale St. Arbor tell you?
 MR. MOTTWEILER: Objection.
 THE COURT: Overruled.
 Q. What did Dale St. Arbor tell you?
 A. He told me he dealt with Rico and Notso with drugs and jewelry.
 Q. Did you ever obtain cocaine from Rico?
 A. Yes.

 Q. Did you ever obtain cocaine from Rico that came from Notso?
 A. Yes.
 Q. When was the first time, sir, that you received cocaine from Oquendo that you know came from Notso?
 A. It was August or September of '94.

2. The exchange between the prosecutor and Oquendo was as follows:
 Q. You started selling to the—would you— I'm sorry. Would you repeat what you said about when you started selling or buying from [Godinez]?
 A. When I started buying from him when—I bought it from him so I could sell it to the Bruce guy.
 Q. And when would that have been?
 A. '93, more or less.
 Q. So you started selling. Were you selling cocaine then to Bruce Hileman in '93?
 A. No, I was selling it to another guy, and then the guy was—

nez's arguments are somewhat muddled, but he appears to claim that these portions of Hileman's and Oquendo's testimony were inadmissible (1) as hearsay falling outside the coconspirator rule, and/or (2) as "prior bad acts" evidence used to show Godinez's propensity to commit the crimes charged in the indictment, which is forbidden by Fed. R.Evid. 404(b). Neither argument is persuasive.

Godinez's challenges to the admission of Oquendo's statements are easily dismissed. First, Oquendo's statements do not constitute hearsay. They were based upon Oquendo's own actions and observations regarding the workings of the conspiracy dating back to 1993. Second, we need not consider whether the challenged testimony was barred by Rule 404(b) because Godinez failed to object to this testimony at trial and its admission was not plain error.

 As for Hileman's testimony, Godinez's first objection, that St. Arbor's statement was inadmissible hearsay, is diffused by Fed.R.Evid. 801(d)(2)(E). Rule 801(d)(2)(E) provides that a statement made by a coconspirator is admissible as non-hearsay if the court determines, by a preponderance of the evidence, that the declarant and the defendant were involved in an existing conspiracy and that the statement was made during and in furtherance of that conspiracy. *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir.) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987)), *cert. denied,* — U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996). We review a district court's findings as to these elements for clear error. *United States v. Mahkimetas*, 991 F.2d 379, 382 (7th Cir.1993).

 It is undisputed that St. Arbor's statement was made in furtherance of the conspiracy. "A coconspirator's statement satisfies the 'in furtherance' element of Rule 801(d)(2)(E) when the statement is 'part of the information flow between conspirators intended to help each perform his role.' Statements that further the objectives of a conspiracy can take many forms, including statements made to recruit potential coconspirators." *Garlington v. O'Leary*, 879 F.2d 277, 283 (7th Cir.1989) (internal citations omitted). St. Arbor's statement informing Hileman of the structure of the conspiracy showed a level of trust in Hileman as the street-level link in the conspiracy's chain and served to help recruit him as a potential member of the conspiracy.

 Regarding Rule 801(d)(2)(E)'s "existing conspiracy" requirement, Godinez argues that the requirement is not satisfied because St. Arbor's statement was made prior to the time frame charged in the indictment, August, 1994 to April 6, 1995. This argument evinces a misunderstanding of the "existing conspiracy" requirement. The Government need not even charge a conspiracy in order for a coconspirator statement to be admitted. *United States v. Cox*, 923 F.2d 519, 526 (7th Cir.1991) (citation omitted). It is irrelevant that the statement was not made within the time frame charged in the indictment.

 Aside from that, St. Arbor's statement itself indicates that the conspiracy among St. Arbor, Oquendo and Godinez was already in existence at the time the statement was made. Under our liberal rules of evidence, a court may consider all nonprivileged evidence in determining whether Rule 801(d)(2)(E) is satisfied. Fed.R.Evid. 104(a). Thus, the Supreme Court has held that so-called "bootstrapping" is a valid mode of establishing the elements of Rule 801(d)(2)(E). *Bourjaily v. United States*, 483

Q. Who was the other guy?
A. Dale St. Arbor.
Q. Do you know where the cocaine that you were selling to Dale St. Arbor was going?
A. Not at first.
Q. Did you eventually find out where it was going?
A. Yes.
Q. Where?
A. It was going to Bruce.

Q. Bruce Hileman?
A. Yes.
Q. How did you first meet Bruce?
A. This guy brought him by my house, Dale.
Q. Dale St. Arbor brought Bruce by your house?
A. Yes.
Q. About when would that have been?
A. Around the same time, '93.

U.S. 171, 178, 181, 107 S.Ct. 2775, 2780, 2781–82, 97 L.Ed.2d 144 (1987). That is, the statement of a coconspirator may be the predicate for its own admissibility:

> [T]he admissibility of conspirators' declarations is not contingent on demonstrating by nonhearsay evidence either the conspiracy or a given defendant's participation. The judge admits the statements; the jury considers them. A judge won't let statements in unless he is satisfied that the accused joined the conspiracy, but Bourjaily says that he may reach the necessary level of satisfaction at least in part on the basis of the hearsay.

*United States v. Martinez de Ortiz,* 907 F.2d 629, 634 (7th Cir.1990) (en banc), *cert. denied,* 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991).

In addition to St. Arbor's statement itself, Oquendo's testimony provided independent evidence that the conspiracy was in existence at the time the statement was made. On direct examination, Oquendo recounted his relationship with Godinez, St. Arbor and Hileman. He testified that Godinez supplied him with cocaine, which he distributed to St. Arbor, who, in turn, distributed the cocaine to Hileman. *See supra* n. 2. Oquendo testified that the conspiracy he described was in place in 1993, obviously before St. Arbor was cut out. Moreover, the structure of the distribution chain Oquendo described and the time frame during which it operated mirrors the structure and time frame of the distribution chain St. Arbor described to Hileman. St. Arbor's statement itself plus Oquendo's testimony show that the conspiracy was indeed in existence at the time St. Arbor made the challenged statement to Hileman. We have no doubt that the "existing conspiracy" element of Rule 801(d)(2)(E) is satisfied and that the challenged statement was admissible as a statement of a coconspirator.

■ Godinez's second objection to the admission of St. Arbor's statement is based on Fed.R.Evid. 404(b), which forbids the introduction of evidence of a person's prior conduct for the purpose of showing a propensity to act in accordance with the character indicated by that conduct. Fed.R.Evid. 404(b); *United States v. Cunningham,* 103 F.3d 553,

556 (7th Cir.1996). We review the district court's decision to admit this evidence for abuse of discretion. *United States v. Runnels,* 93 F.3d 390, 393 (7th Cir.1996) (citation omitted).

St. Arbor's statement is not evidence of a "prior bad act" within the meaning of Rule 404(b), but, rather, is evidence of the conspiracy itself. We already determined, supra, that St. Arbor's statement was made in furtherance of the conspiracy. That being so, the statement was "intricately related to the facts of the case." *See United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). It related directly to Godinez's participation in the conspiracy, it was consistent with the other evidence adduced at trial, and, therefore, it was admissible.

■ Finally, St. Arbor's statement was not so significant that its admission, even if erroneous, would support reversal. The sum of the evidence, minus St. Arbor's statement, demonstrated Godinez's guilt on the conspiracy charge beyond a reasonable doubt, such that the admission of St. Arbor's single allegedly tainted statement to Hileman could have had no "substantial influence" on the jury's verdict. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Mahkimetas,* 991 F.2d at 384.

### 2. Agent Tallent's Testimony

■ The following exchange took place during the Government's direct examination of Agent Tallent:

Q. After your arrest on March 30th of Bruce Hileman, did he begin cooperating with you?

A. Yes, sir, he did.

Q. Did he agree to set up a deal with a person by the name of Rafael Oquendo?

A. Yes, sir, he did.

Q. And how did that come about?

A. Basically, after the 30th, Mr. Hileman was interviewed. He gave us a statement to his activity, to his sources up in the Chicago, Illinois, area. And he began helping us with investigations both in

Southern Illinois and leading back to his source from Chicago, Mr. Oquendo and Mr. Godinez.

MR. MOTTWEILER: Objection. There was—that's pure hearsay. I would object to this witness's statement that that's appropriate testimony.

THE COURT: Overruled.

Agent Tallent's testimony that Hileman named Oquendo and Godinez as his Chicago cocaine source is pure hearsay. The statement was offered for the truth of the matter asserted, and its introduction was prohibited by Fed.R.Evid. 802. With that said, however, the admission of the statement was harmless error. First, there is ample evidence beyond this statement that Godinez was a member of the cocaine conspiracy with which he was charged. Second, the statement to which Agent Tallent testified was made by Hileman, who also testified and was subject to cross-examination. "The basis for excluding hearsay evidence is the notion that statements made while not under oath and while not subject to cross-examination are inherently unreliable." *Lindemann*, 85 F.3d at 1238. Given this rationale and the fact that Hileman testified at trial, the admission of Agent Tallent's testimony was not reversible error.

### C. Enhancement for Obstruction of Justice

Godinez's final contention is that the district court erred by enhancing his offense level two points, under § 3C1.1 of the Sentencing Guidelines, for obstruction of justice. Section 3C1.1 authorizes a sentencing court to enhance a defendant's offense level by two points if it finds, by a preponderance of the evidence, that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1; *United States v. Hickok*, 77 F.3d 992, 1006 (7th Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). The notes to this section list "committing, suborning, or attempting to suborn perjury" as examples of conduct that warrant the enhancement. U.S.S.G. § 3C1.1, application n. 3. Section 3C1.1 applies when a defendant provides false testimony at his own trial "concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993); *United States v. Johnson–Dix*, 54 F.3d 1295, 1311–12 (7th Cir. 1995). A simple denial of guilt, however, is not a basis for an obstruction-of-justice enhancement. *Hickok*, 77 F.3d at 1007 (citation omitted). As a procedural matter, the Supreme Court's *Dunnigan* decision requires that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same...." *Dunnigan*, 507 U.S. at 95, 113 S.Ct. at 1117. Citing these principles, Godinez argues that the district court failed to make a specific finding of perjury and that his testimony was merely a general denial of guilt. We review the district court's obstruction-of-justice finding for clear error. *Johnson–Dix*, 54 F.3d at 1312 (citation omitted).

Our cases hold that "a district judge deciding whether to apply a sentence enhancement for obstruction of justice need not conduct a mini-trial with respect to each of the defendant's false statements, nor is it necessary for the sentencing judge to set forth his findings specifically in terms of the elements of perjury." *Hickok*, 77 F.3d at 1008. The district court's findings at Godinez's sentencing hearing were as follows:

The Court heard the testimony of Mr. Godinez. Remembers it clearly. And the Court is of the opinion that if a defendant gets up and just makes a general denial that he is guilty of the allegations in the indictment, the Court, I think, would be hard pressed to invoke 3C1.1. The problem being is that hardly ever occurs, because as I tell defendants, advise them when they do take the stand in their own defense, and when they're waiving their constitutional right that they are not only subjecting themselves to the examination of their client [sic], but also the cross examination of the government attorney. And invariably, you get into specifics

through either direct examination or cross examination, and which was the case in this, with Mr. Godinez.

And when you get into specifics, Mr. Godinez, in effect, was denying any knowledge at all on the witness stand that there was a cocaine transaction going on. I found that at the time to be not credible and unbelievable and, apparently, the jury did, too. The jury convicted Mr. Godinez, not only probably on the strength of the government's other witnesses, but probably on the testimony of Mr. Godinez.

If the jury had believed Mr. Godinez, they would have found him not guilty, but the jury did not believe Mr. Godinez. The Court did not believe Mr. Godinez as to many of the specifics he was testifying to in both direct examination and cross examination which, in the opinion of this Court, went beyond just a general denial of guilt.

And the Court believes that Mr. Godinez did commit perjury on the stand and under oath, and therefore, the Court is going to overrule the objection of the defense counsel and the defendant regarding the obstruction or impeding the administration of justice under 3C1.1.

Godinez asserts that the district court based its perjury finding "purely upon defendant's plea and claim of innocence and the jury's rejection of it." The district court's comments during Godinez's sentencing hearing belie that claim. The court remembered Godinez's testimony and found it not to be credible. The court acknowledged Dunnigan's requirement that there be particular instances of perjury and then specifically found that Godinez's testimony amounted to a denial of any knowledge that there was a cocaine transaction going on, which the court, as well as the jury, found to be incredible. The denial of knowledge is not the same as a general denial of guilt. The court's findings unquestionably satisfy Dunnigan. We therefore reject Godinez's sentencing challenge.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.