Jose **VENZOR**, Plaintiff,

v.

Julio Cesar **CHAVEZ GONZALEZ** a/k/a Julio Cesar **Chavez**; **Don King Productions**; **Don King**; **Al Braverman**; and **Craig Houk**, Defendants.

No. 96 C 413.

United States District Court,
N.D. Illinois,
Eastern Division.

June 16, 1997.

Robert Orman, Law Office of Robert Orman, Chicago, IL, Jeffrey Wayne Finke, Raleigh and Helms, Chicago, IL, Anne I–Pin Shaw, Robert Orman & Associates, Chicago, IL, for Jose Venzor.

Alan Francis Curley, Susan Valentine, C. Philip Curley, Robinson, Curley & Clayton, Chicago, IL, for Julio Cesar Chavez Gonzalez.

Gerald G. Saltarelli, James A. Morsch, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for Don King Productions, Inc., Don King, Al Braverman.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

As we described in a prior opinion, Plaintiff Jose Venzor, a boxing promoter, alleges that the defendants induced him into paying for a fight that was fixed. *See Venzor v. Gonzalez,* 936 F.Supp. 445 (N.D.Ill.1996). Previously, we granted Venzor leave to file a Sixth Amended Complaint,[1] and now pending before us are the following motions: (1) Defendant Julio Cesar Chavez's motion for summary judgment; (2) a motion for summary judgment from Defendants Don King Productions, Don King, and Al Braverman (the King Defendants); (3) two motions by Venzor relating to Chavez's counterclaim against the plaintiff; and (4) various motions to strike exhibits from the summary judgment motions. For the reasons discussed below, we grant in part and deny in part Chavez's summary judgment motion; grant the King Defendants' summary judgment motion; deny the plaintiff's motions regarding Chavez's counterclaim; and grant in part and deny in part the motions to strike.

## I. Standard for Reviewing Summary Judgment Motions

We previously detailed the factual background of this case, *see Venzor,* 936 F.Supp. at 448–49, and because the amended complaint alleges the same general background, we will proceed directly to the pending motions, starting with the summary judgment motions. Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact, and .... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the initial burden to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Material facts are those determinative of the outcome of an issue as determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once the movant has done this, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).[2] In deciding a motion for

---

1. Venzor previously filed four versions of a complaint in a state court action; his Fifth Amended Complaint in state court re-opened that action and was the first to involve the allegedly fixed fight and federal claims. It was the Fifth Amended Complaint that the defendants removed to federal court.

2. In order to focus litigants on the relevant disputed facts, General Rule 12(M) of the United States District Court for the Northern District Court of Illinois requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine and that entitle

the moving party to judgment as a matter of law." The nonmovant must then specifically respond to each of the movant's factual assertions, and include, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(a). The facts asserted in the movant's 12(M) Statement will be deemed admitted if the nonmovant's responses do not contain citations to specific portions of the record supporting the contrary position. *Skagen v. Sears, Roebuck & Co.,* 910 F.2d 1498, 1500 (7th Cir.1990). In addition, under Local Rule 12(N)(3)(b), the nonmovant may submit a statement of additional facts that the nonmovant

summary judgment, the court must read all facts in the light most favorable to the non-moving party, *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14, and refrain from making credibility determinations, *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir.1992).

## II. Chavez

This litigation arises from what had been a settlement of a suit between Venzor and Chavez. Venzor had sued Chavez for breaching a March 1993 contract to fight a Chicago-area match in which Venzor had invested. The suit charged that Chavez had agreed to the match without receiving permission from King, who owned the exclusive right to promote Chavez's fights. In June 1995, King Productions agreed to release Chavez for a July 1995 match with Defendant Craig Houk and to permit Venzor to promote the fight; in exchange Venzor would pay Don King Productions and Chavez as well as drop the lawsuit against Chavez. Houk lost to Chavez in the first round of their match, and according to Venzor, the fight was fixed.

### A. *Chavez's Knowledge of the Fix*

Chavez's first argument is that there exists insufficient evidence for a reasonable trier of fact to find that Chavez knew the fight was fixed, if it was fixed at all. In response, Venzor points to numerous items of evidence that he asserts show Chavez's awareness and agreement to the fix. *E.g.,* Pl.'s Chavez 12(N) ¶¶ 7–8; Pl.'s Chavez 12(N)(3)(b) ¶¶ 1, 3, 5–12. According to Venzor, Chavez failed to prepare for the fight as he would have if the fight was not predetermined, as evidenced by lackadaisical training and alcohol use during the training period. Additionally, Chavez experienced medical problems soon before the fight that should have posed an unacceptable risk if the fight were not fixed.

Finally, Venzor maintains that a remark made by Chavez before the fight to a fellow boxer was an admission of the fix.

Because we must make all reasonable inferences in favor of the plaintiff and view them in the light most favorable to him, we conclude that there exists sufficient evidence for a reasonable trier of fact to find against Chavez. According to Armando Zenteno, a reporter and author who has extensively followed Chavez's career, Chavez does not drink alcohol while training before fights, and yet Zenteno observed Chavez appear drunk at 2 a.m. on July 23, six days before the fight, although Zenteno had not actually seen Chavez drink. Zenteno Dep. at 44, 56–57. Additionally, Elena Sotomayor, a publicist working with Chavez while he trained in Chicago, believed that Chavez "smelled strongly" of alcohol and appeared hung over in the morning of July 25, just four days before the fight. Sotomayor Dep. at 45. Furthermore, both Zenteno and Venzor observed Chavez drink alcohol at different meals during the training period. Zenteno Dep. at 56–57; Venzor Dep. at 761.

In addition to this departure from Chavez's usual training, Venzor proffers the affidavit of Mario Martinez, a professional boxer who has previously fought against Chavez. Pl's 12(N)(3)(b), Ex. D (Martinez Aff. ¶¶ 1–2).[3] Chavez promised Martinez a rematch after their earlier fight, and on March 1995, Martinez met with Chavez in Guadalajara. Martinez Aff. ¶¶ 2–3. During the meeting, Martinez asked whether he (Martinez) could be Chavez's opponent in the 1995 Chicago fight. According to Martinez, "In response to my question, Chavez told me that I don't go down and he already had an opponent who was going down anyway." *Id.* ¶ 4. When

---

contends require denial of the motion, and Local Rule 12(M) provides that the movant may likewise respond to the 12(N)(3)(b) statement.

**3.** We deny Chavez's motion to strike [212–1] Martinez's affidavit, which is in English, because the plaintiff himself translated the affidavit's contents for Martinez. It would have been more proper for Martinez to sign a Spanish version of the affidavit and *then* for the plaintiff to translate the affidavit into English; Chavez's objection to the use of English slang in light of the reverse route taken by the plaintiff is well-taken. But the approach taken by Venzor does not render the affidavit per se improper for consideration in response to a summary judgment motion, and presumably the plaintiff translated the English slang in the affidavit into equivalent meaning in Spanish. We point out, however, that while we may consider Martinez's statements for summary judgment purposes because they are in affidavit form, the statements are hearsay if presented through Venzor rather than as the in-court testimony of Martinez at trial.

viewed in the light most favorable to the plaintiff, this admission, considered with the above evidence against Chavez, creates genuine issues of material fact for trial.

Our conclusion that a reasonable trier of fact could find against Chavez does not mean, however, that each piece of the plaintiff's evidence by itself points toward liability, or even that all of the evidence detailed by Venzor in his Local Rule 12(N) and 12(N)(3)(b) Statements is admissible. For example, the plaintiff proffers no evidence to rebut Chavez's averment and evidence showing that his physical training sessions leading up to the Houk match was no different from other fights. Chavez's 12(M) ¶¶ 7–9; *see also* Walter Rivers Aff. ¶¶ 2–3; Joe Kaehn Aff. ¶¶ 2.[4] Venzor relies upon scattered references in Zenteno's deposition testimony, *e.g.*, Zenteno Dep. at 54 (referring to a publicity training session), but those excerpts do not rebut the evidence describing the training sessions supplied by Chavez.[5] Our holding, then, should not be taken for more than the existence of genuine issues of material fact that exist for trial.

### B. RICO

We next address Chavez's arguments that are directed at specific theories of liability against Chavez. Of the fourteen counts in the complaint, seven name Chavez: three counts based on the Illinois Boxing and Wrestling Act, 225 ILCS 105/1 to 26 (Counts 4–6); a civil conspiracy count grounded on fraud and the Boxing Act claims (Count 7); a breach of contract count, which we earlier dismissed, *Venzor v. Gonzalez*, 1997 WL 102538, at *3–4 (N.D.Ill. March 5, 1997),

against Chavez for failing to promote the fight (Count 8); and two counts premised on the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 (Counts 12 and 13). We begin with the RICO counts.

According to Count 13, Chavez violated 18 U.S.C. § 1962(c), which prohibits

> any person employed by or associated with any enterprise engaged in … interstate or foreign commerce, *to conduct or participate, directly or indirectly, in the conduct* of such enterprise's affairs through a pattern of racketeering activity ….

(emphasis added). In *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court interpreted the element of § 1962(c) that requires a person to conduct or participate in the conduct of the enterprise's affairs. The defendant In *Reves*, an outside accounting firm, misstated the value of an asset on the financial statements of its client, a farm cooperative; the inflated value allowed the financial statements to reflect a positive net worth. *Id.* at 175–76, 113 S.Ct. at 1167–69. After the cooperative filed for bankruptcy, the cooperative's noteholders sued, among others, the accounting firm. The Court held that the accounting firm had not "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs." § 1962(c).

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate,

---

**4.** We note that the plaintiff moves to strike [199–1] the Rivers and Kaehn affidavits because Chavez insufficiently identified the boxing gyms' owner and coach during discovery in violation of Fed.R.Civ.P. 37(c)(1). However, we deny the motion; while Chavez did not specifically identify the owner and coach of the two gyms by name, Chavez did inform the plaintiff that persons from the two gyms could have relevant information. Pl's Mot. to Strike Rivers and Kaehn Affs., Ex. 6.

**5.** Another example is Venzor's attempt to raise a genuine issue of fact as to whether Chavez took part in a barroom brawl one week before the fight; according to the plaintiff, such involvement would again indicate that Chavez had no

concern about the upcoming fight because it was fixed. However, the only evidence the plaintiff has mustered regarding this fight is the bar owner's statement to Venzor that Chavez had fought in the bar. Pl's Chavez 12(N) ¶ 16 (citing Venzor Dep. at 702–03). The owner, Heliodoro Torres, denies that he ever made such a statement to Venzor, Torres Aff. ¶ 9, and denies that Chavez had been in a brawl, *id.* ¶ 5. Thus, the plaintiff's only evidence as to Chavez's involvement is Torres's hearsay statement, admissible to impeach Torres but not admissible for the asserted fact of the alleged brawl. Without additional evidence, the plaintiff cannot genuinely dispute Torres's averment that no brawl occurred.

directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs.

507 U.S. at 179, 113 S.Ct. at 1170. This requirement, the Court explained, could also be formulated as "participat[ion] in the operation or management of the enterprise itself." *Id.* at 183, 113 S.Ct. at 1172. However, in responding to the government's concern that the operation or management test limited § 1962(c) to upper management, the Court added that "[a]n enterprise is 'operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." *Id.* at 184, 113 S.Ct. at 1173. Recently, the Seventh Circuit adopted the First Circuit's reconciliation of "the Supreme Court's holding in *Reves*—that a defendant must play some part in directing the enterprise's affairs—with its subsequent statement that 'lower-rung participants ... under the direction of upper management' may also 'operate' the enterprise." *MCM Partners v. Andrews–Bartlett & Assocs.,* 62 F.3d 967, 978 (7th Cir.1995) (quoting *Reves,* 507 U.S. at 179–80, 184 & n. 9, 113 S.Ct. at 1170–71, 1173 & n. 9).

> *Reves* is a case about the liability of *outsiders* who may assist in the enterprise's affairs. Special care is required in translating Reves' concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

*United States v. Oreto,* 37 F.3d 739, 750 (1 st Cir.1994) (emphasis in original) (quoted by *MCM Partners,* 62 F.3d at 978). In applying this view of *Reves,* the court in *MCM Partners* held that § 1962(c) reached two exhibition contractors who had reluctantly agreed, under threats of force from a moving equipment leasing company, to shut other leasing companies out of the convention center in which the exhibition contractors staged events. In order to determine whether the exhibition contractors "should be characterized as 'outsiders,' like the accounting firm in *Reves,* or as lower-rung participants who acted under the direction of the enterprise's upper management," the court in *MCM Partners* focused on the

> nature of the "enterprise" [that the plaintiff] has depicted, as both [exhibition contractors] are alleged to be members of an "association-in-fact" constituting the RICO enterprise. In *Reves,* by contrast, the plaintiffs maintained that the farm cooperative itself was the RICO enterprise, and the Court was then required to determine whether the accountants had conducted or participated in the conduct of the cooperative's affairs.

62 F.3d at 979. In addition to emphasizing that the exhibition contractors were alleged to be part of the association-in-fact enterprise, the court in *MCM Partners* pointed out that the goal of the enterprise could not have succeeded without the exhibition contractors. *Id.* Accordingly, the court held that the exhibition contractors were not outsiders, but rather lower-rung participants in the enterprise itself.

Applying these principles to the instant action, a reasonable trier of fact could not find that Chavez conducted or participated in the conduct of the purported RICO enterprise, Don King Productions (DKP). In response to Chavez, Venzor contends that Chavez "invested" over three million dollars in DKP by receiving less than his specified fight purses from DKP and by paying DKP expenses, and that Chavez received unsecured loans from DKP. Pl.'s Chavez Resp. at 7. However, the plaintiff cites no authority that establishes financial relationships such as Chavez's as equivalent to operation of an enterprise's affairs. Nor does Chavez's appointment of DKP as his "attorney-in-fact," Pl.'s Chavez Resp. at 7–8, show that Chavez could direct DKP's affairs; rather, such an appointment only authorized DKP to act for Chavez in certain respects. Finally, Venzor relies on *MCM Partners* for the proposition that Chavez, even as a nonemployee of DKP,

could violate § 1962(c) by knowingly implementing decisions. Pl.'s Chavez Resp. at 8. However, the court in *MCM Partners* characterized the defendants as inside, lower-rung members of the enterprise itself, and thus they were liable for implementing the enterprise's decisions. In contrast, as an outsider, Chavez cannot be held liable unless he participated in operating DKP's affairs, and the plaintiff has failed to raise a genuine issue as to that factual contention. Accordingly, we enter summary judgment for Chavez on Count 13.

■ As for Count 12, Venzor maintains that Chavez violated § 1962(d), which prohibits conspiracies to violate any of the other substantive provisions of § 1962(a)-(c). We explained above why the § 1962(c) against Chavez will not proceed, and there is also no evidence of a conspiracy to violate that subsection. Similarly, there is no genuine issue regarding the claim based on a conspiracy to violate § 1962(b), which prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in . . . interstate or foreign commerce." Venzor fails to produce evidence that whatever interest in or control of DKP Chavez holds was acquired or maintained through a pattern of racketeering activity. In other words, the plaintiff proffers no evidence linking the racketeering activity he attributes to Chavez and any interest or control wielded by Chavez over DKP. This same lack of evidence undermines Venzor's claim that Chavez conspired to violate § 1962(a), which renders it illegal "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal . . . ., to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in . . . interstate or foreign commerce." Venzor can point to no evidence that links Chavez's financial dealings with DKP as derived from a pattern of racketeer-

ing activity. In sum, no reasonable trier of fact could find that Chavez engaged in a § 1962(d) conspiracy to violate the provisions of § 1962(a)-(c), and we thus enter summary judgment on Count 12.

### C. Illinois Boxing Act

We next turn to Chavez's attack upon the plaintiff's Illinois Boxing Act claims (Counts 4–6). In an earlier opinion denying a motion to dismiss these claims, we held that there exists an implied private right of action under the Act. *See Venzor*, 936 F.Supp. at 454–55. We reasoned that the Illinois Supreme Court had implied causes of action in similar statutes after examining, among other requirements, whether the "plaintiff is a member of the class for whose benefit the Act was enacted." *Id.* at 454 (quoting *Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill.Dec. 489, 496, 574 N.E.2d 602, 609 (1991)). We explained that Venzor, as a "promoter" and thus a regulated person under the Act, 105/10(a), was "a member of the class of persons that the Act sought to protect; regulated persons seem to be protected from fellow regulated persons." *Id.*

■ During discovery and at this stage of the litigation, however, Venzor admits that he never applied for, and was never licensed as, a promoter under the Act. Pl.'s Chavez 12(N) ¶ 23. Thus, Venzor does not fall within the ambit of the Act's regulatory framework. Given the strict prerequisites imposed by Illinois law when determining whether a plaintiff may bring an implied cause of action, *cf. Corgan*, 158 Ill.Dec. at 496, 574 N.E.2d at 609, we hold that Venzor's failure to obtain a promoter's license prevents him from proceeding under the Act. While a spectator, although not a regulated person under the Act, perhaps could bring an implied cause of action, Venzor is expressly suing as a promoter, Pl.'s King Resp. at 17,[6] and seeks damages as a promoter and not as a spectator. Accordingly, we enter summary

---

**6.** In their own summary judgment motion, the King Defendants make a similar argument against the Boxing Act claims. Chavez refers us to the King Defendants' arguments and Venzor similarly refers us to his response to those arguments.

judgment against the plaintiff on Counts 4–6.[7]

## D. Damages

Next, Chavez contends that insufficient evidence of the plaintiff's damages exists to justify a trial. While we agree that certain categories of damages are not recoverable based on the evidence Venzor proffers, we ultimately conclude that sufficient evidence as to other types of damages would permit a reasonable fact-trier to find for the plaintiff. As we explained above, the RICO claims and Illinois Boxing Act claims against Chavez do not survive summary judgment, and thus we focus on the remaining fraud claims premised on state common law and the Illinois Consumer Fraud Act (ICFA).[8]

■ To the extent that the plaintiff seeks lost profits caused by the fix, he fails to present sufficient evidence that any such loss resulted from the purported sham. Venzor admits that "no ticket sales and no promotional sponsorships were lost by reason of the alleged fix," Pl.'s Chavez 12(N) ¶ 28, presumably because news of the fix was not generally known prior to the fight. Venzor tries to blame low attendance at the fight on Chavez's poor training by relying on a vague remark from the deposition testimony of Henry Cardenas, who testified that ticket prices were reduced to encourage attendance. Pl.'s King 12(N) ¶ 68 (citing Cardenas Dep. at 234). However, Cardenas's testimony does not link the low sales to the fix. *See id.* In addition to the absence of evidence justifying lost profits damages, no one has demanded a refund from Venzor after the fight as well. *Id.* ¶ 29. Accordingly, no evidence supports the recovery of lost profits or of reimbursement for refunds.

■ In our view, however, the plaintiff may recover the consideration he paid to Chavez for fighting in the allegedly sham fight, provided Venzor can prove the fraud. Venzor has paid $102,000 to Chavez for the match against Houk, and under Illinois law, "[o]ne induced to contract through the fraud of another may at his election rescind the contract and recover the consideration that he has paid." *In re Estate of Neprozatis,* 62 Ill.App.3d 563, 19 Ill.Dec. 470, 476, 378 N.E.2d 1345, 1351 (1978); *see also Chicago Park Dist. v. Chicago & North Western Transp.,* 240 Ill.App.3d 839, 180 Ill.Dec. 787, 800, 607 N.E.2d 1300, 1313 (1992); *Equity Capital Corp. v. Kreider Transp. Serv.,* 967 F.2d 249, 253 (7th Cir.1992) (diversity case, "Under Illinois law, a party fraudulently induced into signing a contract is, as a general matter, entitled to rescind the deal."). Furthermore, "a person who is adjudged guilty of fraud is not entitled to a profit." *In re Estate of Neprozatis,* 19 Ill.Dec. at 476, 378 N.E.2d at 1351. Such a recovery is *not* equivalent to recouping lost profits of an investment, which the plaintiff has not linked to the fixed fight; indeed, to the extent that Venzor profited from the fight, that amount must be offset against Chavez's liability. *Puskar v. Hughes,* 179 Ill.App.3d 522, 127 Ill.Dec. 880, 885, 533 N.E.2d 962, 967 (1989) Rather, the return of the consideration paid for Chavez's services represents a recovery of the inflated value of those services; presumably, the plaintiff would not have paid Chavez to fight in a staged match.[9] Addi-

---

7. This conclusion also applies to the Boxing Act claims as asserted against the King Defendants.

8. We note that, although the Sixth Amended Complaint alleged diverse residency of the parties rather than citizenship, the defendants' original notice of removal properly alleged that there is diversity of citizenship between the two sides of the action. Notice of Removal (Jan. 22, 1996).

9. In light of our disposition of Chavez's summary judgment motion and the damages question, we deny Chavez's request that summary judgment be entered for him on his counterclaim against Venzor for the unpaid balance of the promised fight purse. Chavez's Summ. J. at 18–19. Likewise, the plaintiff's motion for judgment on the pleadings [197–1] as to the counterclaim is denied. The allegations of the complaint, Chavez's answer, and the counterclaim sufficiently allege that Chavez performed the contract to fight Houk and that Venzor has not yet paid the entire purse. Lastly, the plaintiff's motion for leave to add an additional affirmative defense [183–1] against the counterclaim is denied; the proposed amendment alleges that Chavez's alcohol use and lack of training violated an "implied duty of good faith and fair dealing," but restraint from using alcohol and better training are not the sort of covenants that were necessary for Venzor to receive the benefit of the contract. *See M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir. 1990). To the extent that the plaintiff seeks to add an additional affirmative defense to contest

tionally, part of the consideration that Venzor exchanged for Chavez's promise to fight Houk included the settlement of the then-pending state court claim against Chavez for breaching the March 1993 agreement to fight in the Chicago area, a claim assertedly worth at least $229,355. King Defs.' 12(M) ¶ 59, Ex. 4 (citing Venzor Dep. at 916–21). Whether the plaintiff will convince a fact-finder of that valuation of the original claim against Chavez is another matter, but there are genuine issues of material fact as to damages.

After taking into account the above rulings, what remains against Chavez are the relatively straightforward state law fraud and conspiracy to defraud claims as theories of liability. And if the plaintiff can show liability, then the available damages include the consideration paid to Chavez for the allegedly fixed fight. We now turn to the King Defendants' summary judgment motion.

### III. King Defendants

The reasoning as to certain counts discussed above also disposes of the parallel claims against the King Defendants. Accordingly, we enter summary judgment for the King Defendants as to the Boxing Act claims (Counts 4–6). This leaves the following claims against the King Defendants: breach of contract premised on the fact that Houk did not have a 47 win and 6 loss record as promised (Count 1); common law fraud, statutory fraud, and conspiracy to commit fraud (Counts 2, 3, and 7); and violations of RICO, § 1962(a), (b), and (c), and conspiracy to violate RICO, § 1962(d) (Counts 9–11 and 14). As we explain below, because important pieces of evidence admissible against Chavez and Houk are *not* admissible against the King Defendants, a reasonable trier of fact cannot find the King Defendants liable on the fraud and RICO claims. Additionally, because the plaintiff fails to present sufficient evidence as to his damages for breach of contract, summary judgment is proper on that claim as well.

■■■ To start, the statements made by Chavez to Mario Martinez in March 1995, which are presented in Martinez's affidavit

discussed earlier, are inadmissible against the King Defendants because the statements are not party-admissions as against the King Defendants. Rule 801 (d)(2)(A) of the Federal Rules of Evidence defines as non-hearsay a statement that "is offered against a party and is (A) the party's own statement in either an individual or representative capacity." Accordingly, because Chavez was not acting as King's representative, Chavez's statements are inadmissible against the King Defendants. *See United States v. Curry,* 977 F.2d 1042, 1057 (7th Cir.1992). The same admissibility problem infects Houk's admission to Venzor in late 1995 and to a newspaper reporter in 1996 that an employee of DKP, Defendant Al Braverman, told Houk to "go down and make [Venzor] look bad in doing so," presumably because Braverman thought Venzor was "arrogant." Pl.'s King 12(N)(3)(b) ¶¶ 1–2 (citing Venzor Aff. ¶ 1 and Jorge Oclander Dep. at 119); King Defs.' Mot. to Strike ¶ 5. Although Braverman's statement to Houk would presumably be admissible as a party-admission against the King Defendants, Houk's statement to Venzor and the reporter reciting that Braverman made such a statement is not a party-admission against the King Defendants. Although the plaintiff argues that the prior statements of parties are admissible to impeach that party's credibility, Pl.'s Resp. to King Mot. to Strike at 2, the statements are not admissible as substantive evidence against other parties who did not make the statements.

■■■ Nor are Chavez's or Houk's statements admissible as non-hearsay statements made "during the course and in furtherance of the conspiracy" with the King Defendants. Fed.R.Evid. 801(d)(2)(E). Despite the multiple forms which co-conspirator statements may be "in furtherance" of a conspiracy, there must be at least a "reasonable basis" for finding that the statements were made to help further the conspiracy's objectives. *Garlington v. O'Leary,* 879 F.2d 277, 283–84 (7th Cir.1989). Neither Chavez's nor Houk's statements can be reasonably viewed as furthering the conspiracy to fix the Chavez–Houk fight. Indeed, Chavez's statements in March 1995 stand in contrast to

the amount of the purse, that is already placed in issue by his prior answer to the counterclaim.

statements made to recruit other conspirators, a common variation of the admissible co-conspirator statement, *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir.1997); *United States v. Guyton*, 36 F.3d 655, 659 (7th Cir.1994). And Houk's statements to Venzor in November or December 1995 and the reporter in 1996 were made after the conspiracy's "central objectives" were obtained, *United States v. Xheka*, 704 F.2d 974, 985 (7th Cir.1983) (quoting *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957)), and thus fail not only to be "in furtherance" of the conspiracy but were also made after the conspiracy.[10]

■ Furthermore, we reject Venzor's argument that Houk's hearsay statements are admissible under Rule 804(b)(3) as statements against penal interest. According to the plaintiff, Rule 804's requirement that the declarant be unavailable is met because Houk lives and works outside the 100–mile range of a civil subpoena. Pl.'s Resp. to King Defs.' Mot. to Strike. However, that limitation on a trial subpoena applies only to "a person who is *not* a party." Fed.R.Civ.P. 45(c)(3)(A)(ii) (emphasis added). There is no reason to believe that Houk will be unavailable to testify at trial, and thus Rule 804(b)(3) is not a basis to admit Houk's statements.

■ Without Chavez's and Houk's hearsay statements, the plaintiff's remaining evidence fails to raise a genuine issue as to the King Defendants' involvement in the allegedly fixed fight. Venzor attempts to link DKP to an "Indiana–Oklahoma Connection"

comprising boxers, managers, and promoters who fixed numerous fights, including fights involving Houk and his manager Pete Susens. *See* Pl.'s King 12(N)(3)(b) ¶¶ 9–13. However, to prove the operation of the Indiana–Oklahoma Connection, the plaintiff points only to a Special Report prepared by the administrative assistant of an Oklahoma Labor Commissioner. *Id.* ¶ 9. The portions of the Special Report to which Venzor cites, however, simply contain statements from two boxers interviewed by the administrative assistant. *Id.* Ex. 7 (Report at 10–12).[11] No widespread ring of boxers is proven or inferable from these statements alone, and the two interviewees make no mention of Houk. In addition, Venzor fails to adequately support his contention that DKP "purchased boxers from the Indiana–Oklahoma Connection" on approximately twenty-four fight cards, with all but one boxer losing their fight. *Id.* ¶ 12. The plaintiff cites only to the deposition testimony of Fred Berns, who is apparently a former partner of Susens, but Berns's testimony only confirms that he supplied fighters for DKP, not that he engaged in fight fixing. Berns Dep. at 55, 160–61. Although the plaintiff points to scattershot evidence that at least a few boxers and promoters fixed fights, the evidence *admissible* and actually directed against the King Defendants is insufficient for a reasonable trier of fact to find against those defendants. Accordingly, we enter summary judgment for the King Defendants on the claims premised upon their involvement in the fixed fight, specifically, the fraud counts (Counts 2, 3,

**10.** These same problems also disqualify for admission under Rule 801(d)(2)(A) and (E) another hearsay statement made by Houk and relied upon by the plaintiff. According to Jacob Hall, an Indiana Boxing Commissioner, Houk admitted to Hall during an October 30, 1996 phone conversation that a promoter named Pete Susens drove Houk to various fights and "would tell [Houk] where they were going, what name to use, what social security number, what birth date to use, and how the fight was going to come out." Pl.'s 12(N)(3)(b) ¶ 11 (referring to Hall Dep. at 64, 68). Again, that statement is a party-admission admissible against Houk but not against the King Defendants, was made after the conspiracy to fix the Chavez–Houk match ended, and did not further any such conspiracy.

**11.** While hearsay statements reported in a governmental investigative report may be admissible under Fed.R.Evid. 803(8), the boxers' interview statements are not "factual findings" of the Oklahoma Labor Commissioner. *See United States v. D'Anjou*, 16 F.3d 604, 610–11 (4th Cir.1994). Additionally, the unsworn statements of boxer Keith Whitaker are not against his interest, nor do Whitaker's statements and the similarly-unsworn statements of Mike Smith implicate Houk. This is not to say that the report is, as a factual matter, inaccurate; however, as a matter of law, the statements do not raise genuine issues of material fact as to this litigation.

and 7) and RICO counts (Counts 9–11 and 14).[12]

 Finally, we enter summary judgment against the plaintiff on his breach of contract claim against the King Defendants (Count 1). Venzor grounds this claim on his belief that, rather than 47 wins and 6 losses, Houk's record was really 40–11 at the time the King Defendants contracted to deliver his services as Chavez's opponent. Pl.'s 12(N)(3)(b) ¶¶ 32–36. However, even if the King Defendants breached the contract by supplying a fighter with a worse record than promised, the plaintiff proffers no evidence as to the benefit of the bargain damages that he incurred as a result. *See Sager v. Friedman*, 270 N.Y. 472, 1 N.E.2d 971, 973–74 (1936) (benefit of the bargain damages for breach of contract) (cited by *Ostano Commerzanstalt v. Telewide Sys.*, 794 F.2d 763, 767 (2d Cir.1986)).[13] Just as Venzor presented insufficient evidence of lost profits against Chavez, there is no evidence to support that attendance was poor because of the King Defendants' alleged breach, or that any refunds have been sought, or that Venzor has been damaged in any other way by the breach. Accordingly, summary judgment is entered for the King Defendants on Count 1.

## IV. Conclusion

For the reasons detailed above, we grant summary judgment for Chavez on Counts 4–6 and 12–13; what remains as to Chavez is the state common law fraud, statutory fraud, and conspiracy to defraud, as well as Chavez's own counterclaim against Venzor for the unpaid balance, if any, of the purse. We enter summary judgment for the King Defendants as to all claims. The status hearing and filing of the pretrial order is reset from June 13, 1997 to July 1, 1997 at 10 a.m. The remaining parties, including Defendant Craig Houk, shall appear at that time. It is so ordered.

---

**12.** We note that, rather than present arguments in their summary judgment motion, the King Defendants filed and briefed a separate motion to strike various exhibits and references to evidence that the King Defendants believed inadmissible. In light of our conclusion on their summary judgment motion, the motion to strike is granted in part, denied in part, and denied as moot in part as consistent with the above discussion.

**13.** We earlier held that New York law governed the contract claims based on a choice of law selection clause in the parties' contract. *Venzor*, 1997 WL 102538, at *3 n. 10.